ASA G. CANFIELD, Appellant, v. IOWA DAIRY SEPARATOR COMPANY, Appellee.

**MASTER AND SERVANT:** "Knowledge" as Element of Negligence—Usual Manner of Work—Poison. Knowledge, actual or constructive, is an essential ingredient of negligence. Therefore, when the master carries on his business in the usual and ordinary manner, without knowledge that such manner is or may be dangerous to the servant, he is not liable for resulting injury to the servant. So held where the servant was injured by poisonous substances deposited on the articles on which he worked.

PRINCIPLE APPLIED: In the construction of the "core" of a cream separator, it was necessary to punch openings in the tin parts in order to insert a tin "spacer". This process necessitated (a) the liberal use of oil and (b) the immersion of the parts in a solution of water and muriatic acid, after which the parts were given a bath in running water in order to clean off the oil and acid. Adhering oil and acid, however, formed a poisonous amalgam on the parts, which injured the servant whose duty it was to handle them and insert the "spacers" in the openings. The servant worked eight months at this work, during the last three of which he noticed his injuries. He made no complaint until he stopped work. No other workman in the same work was injured. *There was no evidence* (a) that the solution was not a proper one, or (b) that the oil was impure, or (c) that the process was not the usual or ordinary way of doing such work, or (d) that the master *knew*, or by ordinary diligence *ought to have known*, of the presence of the amalgam or that the parts were in any wise dangerous to the servant. *Held*, the servant had not established the master's liability.

*Appeal from Black Hawk District Court.*—HON. FRANKLIN C. PLATT, Judge.

TUESDAY, OCTOBER 19, 1915.

ACTION for personal injuries.  Judgment for defendant. Plaintiff appeals.—*Affirmed.*

*Loren Risk* and *W. W. Wooley,* for appellant.

*Edwards & Langley* and *Lawley & Wheeler,* for appellee.

GAYNOR, J.—This is an action brought by an employee of a manufacturing corporation to recover damages on account of a disease claimed to have been contracted as a result of the use of certain acid and oils negligently furnished by his employers.

MASTER AND
SERVANT:
"knowledge"
as element
of negligence:
usual manner
of work: poison.

The record discloses that the plaintiff was about sixty-two years old; had worked for the defendant in its factory at various jobs, since November 15, 1907.  For a number of months immediately prior to the beginning of his illness, he had been putting spacers in cones.  This is the work in which he was engaged when the disease complained of appeared.  He began this particular work about June 10, 1910.  In November, 1910, the trouble first appeared and continued to develop and grow worse until February, 1911, when he quit work.

The work of putting spacers into cones was one of the many steps taken in the construction of cream separators. Part of the mechanism of the separator is a core built of small tin cones, each cone three or four inches high and two or three inches in diameter, the size, of course, depending upon the particular separator for which it is intended.  In building the core, a number of cones are used, one imposed upon another until the desired length of core is attained.  The cones do not come in close contact with each other.  The space between the cones is slight.  The cones are held apart by means of small pieces of tin called spacers.  This spacer is a strip of tin, the ends of which are tapered and rounded to form a rough and elongated ellipse.  Before the spacers are

put in, triangular shaped slots are made in the sides of the cone. Plaintiff's work was to insert these bent pieces of tin or spacers in the slots or holes in the cone, and then, by means of a lever, bring down a weight onto the cone, which pressed the spacers flat on the cone. After the slots were cut in the cones for the purpose of inserting spacers, the cones were then dipped in a solution of water and muriatic acid, and then later passed through a bath of running water for necessary purposes in the perfection of the work. They were then carried to the plaintiff and deposited with him for the purpose of receiving spacers.

The plaintiff in his testimony states the facts substantially as follows:

In order to place the spacers in the cones, it was necessary that certain little slots by some mechanical device be cut in the cones and through them, and in the cutting of the slots, it was necessary to use considerable oil as the machinery through which it passed was a very delicate piece of mechanism. "Mr. Schram generally cut those little slots in there to receive the spacers, and to cut these, he had to use considerable oil because it was a delicate piece of machinery and easily broken. After the slots were cut, they went back down to the shop, and then went through a solution or acid. When they went through this solution or acid, they were brought back to the department where the slots were cut, and I put these little spacers in after they came direct from the shop. When the cones came up there, some would have a rusty appearance and some would be kind of wet, like they had been in saleratus, or something over them, and in others there would be streaks of green. This is the way they came up after they had been through the solution. A great many of them were wet, and I was required to handle them when they were wet. I could not stand up to do the work, so I used a stool. The water would get on my hands and clothing enough to wet me through sometimes or very near it on my abdomen. Sometimes

the water would drip on my clothing and down on my arms and legs.''

In speaking of the use of the oil, he said:

''When they put oil on the machine that cut the holes, there is an upright concern and they put oil up here, and the oil runs down this shaft and connects with the little punch that makes the holes. They had to keep lots of oil on here to keep the little punch from breaking. If they got the least bit dry in cutting they would split and break off.''

In speaking of the acid and its use, the plaintiff said, in substance, that, after they were oiled and the slots cut in them, these cones were dipped in a solution of muriatic acid, after which they were dipped in a large tank of water standing there for that purpose, and used by the defendant company for the purpose of washing from the surface of the cones the solution of acid before the cones were sent up to the department where he was engaged in work; that, in order to perform his duties, it was necessary that he remain in a sitting position and handle these cones when they came to him, some of which were wet and some dry, some covered with a liquid solution and some with a sediment. In speaking of this, he says that the solution and sediment were amalgamated with muriatic acid, in which fluid they were immersed for necessary purposes. He says that he was not familiar with the process used in preparing the cones at the time or previous to the time they were delivered to him for the purpose of placing the spacers in them; that, prior to commencing this particular work, he was in no way diseased; that his blood was in the best condition; that he had no eruptions upon his skin; never had been ill; that in his work he was required to handle a great many of these cones; that sufficient quantities of the fluid in which the cones were immersed ran from the cones down his fingers and about his hands so that it dripped from the same to his abdomen and limbs,

saturating his clothing in and about his abdomen and limbs; that a short time after said fluid soaked through his clothing to his skin, a large inflamed 'thick reddish-colored abrasion about the size of a man's hand appeared across the abdomen; that he had a distressed feeling; that his stomach bloated and he did not have a good appetite; that he did not feel well; that this first appeared about November, 1910, but he stayed at his work until February, 1911. It does not appear that he made any complaint of his condition until after he quit. It does appear that his abdomen and limbs became covered with boils—a particular description of which is not necessary to an understanding of this case.

Plaintiff, in stating his cause of action, predicates his right to recover on what he claims to be the negligence of the defendant, and the only acts or omissions to act on which he bases his claim of negligence are: (1) Defendant was negligent in not washing the acid from the cones before they were delivered to him to be handled; (2) it was negligent in delivering to him and requiring him to work with cones while covered with oil, at such time and in such manner that the acid and oil would become amalgamated, and thereby become poisonous and dangerous.

The cause was tried to a jury. At the conclusion of plaintiff's testimony, the court directed a verdict for the defendant; judgment being entered upon the verdict, plaintiff appeals. The only error assigned is that the court erred in directing a verdict for the defendant. The facts hereinbefore set out are not in dispute.

Assuming, for the purposes of this case, that all that the plaintiff has shown is true, and assuming that the use of oil and muriatic acid upon these cones, in the manner in which it was used, produced the condition of which plaintiff complains, still, the action of the court in directing the jury to return a verdict for the defendant must be sustained.

Nowhere in the plaintiff's petition is it charged that the defendant knew, or by the exercise of reasonable diligence

should have known, that these cones, when they came to the plaintiff, were in a condition that rendered it dangerous and unsafe for the plaintiff to handle them in the work assigned him to do. Nor is there any proof that the defendant knew that the dipping of these cones in muriatic acid, in the manner shown by this testimony, rendered it dangerous and unsafe for the plaintiff to handle them in the discharge of his duties; nor are any facts alleged or shown from which an inference could be drawn that the defendant knew, or by the exercise of ordinary care should have known, that the handling of these cones in the condition in which they were might affect plaintiff's health or inflict upon him any bodily injury. It affirmatively appears that, in the cutting of these slots in these cones, it was necessary to use considerable oil. There is no evidence that the oil used was not absolutely pure. It does not appear that the dipping of these cones in a solution of muriatic acid was not the usual and ordinary way of treating the cones in the process of preparing them for the machine of which they were to be a part. Indeed, the record would rather affirm that this was necessary. There is not only no evidence that this was not the usual and ordinary way of doing that particular work and accomplishing the purpose sought to be accomplished, but it affirmatively appears that the dipping in the solution of muriatic acid was necessary to the preparation of the cones for proper use in the completed machine. Appellant's counsel seems to concede this fact, and he says:

"It appears from the testimony that this solution or sediment was amalgamated with muriatic acid through which fluid the same was immersed for necessary purposes."

It does not appear that the proportion of muriatic acid in the solution in which these cones were washed was not the proportion necessarily and usually and ordinarily used for the purpose of cleansing metal. It does not appear that the

plaintiff made any complaint; although he discovered erup-
tions, he claims, as early as November, 1910. It does not
appear that any other person in the employ of the defendant
suffered the effects complained of by the plaintiff while in
defendant's employ in the same capacity. There is no allega-
tion in the petition that the defendant knew, or by the exer-
cise of reasonable care should have known, that there was any
poisonous substance upon these cones when they were delivered
to the plaintiff. The evidence shows that they were immersed
in water for the purpose of cleansing them before they went
to the plaintiff. There is no claim that the defendant knew
and failed to notify the plaintiff of any danger attending the
handling of these cones in the condition in which they came
to the plaintiff. The plaintiff does not base any claim upon
any failure on the part of the defendant to warn him of
danger or to instruct him as to the proper handling of these
cones.

In disposing of this case, we are confined to a considera-
tion of the acts, or omissions to act, charged by the plaintiff
as constituting negligence and of which he complains.

In *Corcoran v. Wanamaker*, decided by the Supreme
Court of Pennsylvania on April 11, 1898, reported in 39 Atl.
1108, an action to recover damages for a loss of sight by
poisoning from acids used in defendant's laundry, in which
plaintiff was employed, the court said:

"There is no evidence that the defendants had any knowl-
edge that the use of the acids complained of would produce
the disease from which the plaintiff suffered, and there was
no proof that it was not customary to use acids in laundries
in the same manner and proportions as they were used in the
laundry business conducted by the defendants. The case was
therefore destitute of the evidence necessary to establish the
charge of negligence, without which there could be no
recovery."

See, also, *Pinkley v. Chicago & E. I. R. Co.*, 246 Ill. 370 (92 N. E. 896). This was an action in which an employee of the defendant was injured from fumes from lumber dipped in creosote. The act charged as constituting negligence was the act of the foreman in directing the injured party to unload the piling from the car with his hands and without cant hooks. The court, in disposing of this case, said:

"In view of the cause to which appellee attributes his injuries, such act could only be negligence upon proof, first, that the preparation with which the timbers had been treated was poisonous and liable to injure a person engaged in handling the timbers; second, that appellant knew, or by exercising ordinary diligence might have known, that it was poisonous and capable of producing injury; and, third, that the appellee did not know that it was poisonous and likely to injure him, and did not have equal opportunity with appellant of knowing thereof at the time he was injured. . . .

"That the preparation and the fumes therefrom were poisonous and did produce the injuries of which appellee complains must be regarded as established; that the preparation and fumes arising therefrom were liable to blister the skin, causing the skin to peel off and produce a burning sensation, and that appellant had knowledge thereof, must be regarded as established; but the record discloses that appellee also knew that such injuries were likely to follow from handling the piling. . . . 'But that was not the danger complained of. The danger complained of was poisoning of the system resulting in permanent injury. He knew it would redden the skin, smart and burn and blister; but he did not know it was dangerous in the sense that an abundance of it breathed into the lungs and taken into the system would permeate the whole system and create systemic poisoning; nor did he know that this burning and parching of the skin would result in eczema.' The record in this case, therefore, fails to establish any duty owing by appellant to warn appel-

lee, before or at the time of ordering him to assist in unload-
ing the piling from the car, that the substance with which the
timbers had been treated was liable to blister the skin, cause
the skin to peel off, and produce a burning sensation, and for
such injuries it is clear that appellee could not recover.''

The court thereupon propounded this question:

''Does the- fact that the injuries which appellee received
were more serious than he anticipated and resulted in a dis-
ease of a permanent nature render appellant liable in the
case? In our judgment, it does not. The record shows that
appellant, as well as other companies, had been using this
coal tar preparation on timbers for a number of years, and
fails to disclose any injuries other than blistering and peeling
off of the skin, except in the case of appellee and an employee
of the Illinois Central R. Co. on the same day. . . . Under
such circumstances, a finding that appellant knew, or by the
exercise of ordinary diligence might have known, that the
coal tar preparation was liable to produce the injuries of which
appellee complains, is manifestly without any evidence what-
ever to support it. If the appellant did not know, or by the
exercise of ordinary diligence could not have known, that
such injuries were liable to result, then the law did not impose
any duty upon it to warn appellee of the danger of receiving
such injuries, before or at the time of giving the order which
appellee alleges was negligently given.''

See, also, *Gould v. Slater Woolen Co.,* 147 Mass. 315.

As bearing upon the question under consideration, see
*Kitteringham v. Sioux City & Pac. Ry. Co.,* 62 Iowa 285, in
which the doctrine is laid down that, where a party charged
with negligence does not know, and nothing has occurred to
suggest to him that there is any danger in a certain line of
conduct, he cannot be said to have had such means of knowl-

edge of the danger as to render him negligent in continuing in that line.

In the instant case, the record fails to show that the defendant knew that the use of muriatic acid, in the manner in which it was used, imperiled the health or safety of the plaintiff, and fails to disclose a state of facts from which it could be reasonably inferred that, by the exercise of reasonable care, it could or should have known. It cannot be held, therefore, for negligence in the use of muriatic acid in the way and for the purposes for which it was used.

We hold, therefore, that there was no evidence showing actionable negligence on the part of the defendant, and for that reason the case must be affirmed.

There are other points discussed in argument which, in the view we take of the case, it is not necessary to pass upon. —*Affirmed.*

DEEMER, C. J., LADD and SALINGER, JJ., concur.