LEWIS MILLER *vs.* THE AMERICAN STEEL AND WIRE COMPANY OF NEW JERSEY (AMERICAN STEEL AND WIRE COMPANY'S APPEAL FROM COMPENSATION COMMISSIONER).

Third Judicial District, New Haven, January Term, 1916.
PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

The "personal injury" for which an employee may be entitled to compensation under our Workmen's Compensation Act (Public Acts of 1913, Chap. 138), has reference to the same kind or character of injuries as those for which he could theretofore have sued at common law; and inasmuch as no intent to enlarge this field of recovery appears from the language of the statute or from its legislative history, the Act cannot properly be construed to include occupational diseases, so-called, which are not the direct result or natural consequence of an accidental bodily injury. (*One judge dissenting.*)

Miller *v.* American Steel & Wire Co.

In the present case the employee was unable to work for a time solely because of lead poisoning which he contracted gradually from the fumes of molten lead in the room where he was employed. *Held* that he was not entitled to compensation under the **Workmen's** Compensation Act. (*One judge dissenting.*)

Argued January 21st—decided April 19th, 1916.

APPEAL by the respondent from an award of the Compensation Commissioner for the third district, taken to the Superior Court in New Haven County, *Webb, J.*, where the award of the commissioner was confirmed *pro forma* and judgment entered accordingly, from which the respondent appealed. *Error, judgment set aside and cause remanded for rendition of judgment vacating commissioner's award.*

It appears from the finding of the commissioner that the claimant, on or about March 26th, 1915, and for some time prior thereto, had been in the employ of the respondent at New Haven, and about said date received at New Haven an injury arising out of and in the course of his employment, which injury consisted in lead poisoning, contracted by working in and about a room in which were molten lead, fumes arising from molten lead, and small particles of lead and its compounds on the floor and throughout said room. In consequence of this injury the claimant was totally incapacitated for a short time, and was awarded $7.14.

*Frank F. Dresser* of Worcester, Massachusetts, with whom were *Frederick A. Carroll*, also of Worcester, and *Arthur M. Marsh*, for the appellant (respondent).

No counsel appeared for the appellee (claimant).

BEACH, J. An examination of the finding, in the light of the commissioner's memorandum of decision, convinces us that for the purposes of this appeal we

must assume that the claimant's incapacity resulted from a gradual process of lead poisoning arising out of the claimant's employment; that it cannot be traced to any fortuitous or unexpected event which can be located in point of time and place; and that it is not the result of a lesion produced by external violence or internal strain. The record, therefore, does not present the question whether our Workmen's Compensation Act gives compensation for death or incapacity resulting from disease caused by accidental injury. It presents the very different question whether our compensation system includes occupational diseases as well as industrial accidents. More specifically, the question is whether the words "personal injury . . . arising out of and in the course of his employment," in our Act, were intended by the General Assembly to cover disease arising out of and in the course of the employment.

There is no reference whatever to disease in our Act, and although the case nominally turns upon the proper construction of the single word "injury," the real issue is whether the important subject-matter of industrial diseases shall be introduced by judicial construction into a statute which does not mention the subject, or contain any provisions for dealing with the problems peculiar to that subject. It is to be regretted that the appellee was not represented by counsel in this court, and that we are compelled to pass upon a question of such importance without the benefit of full argument upon both sides.

We have said in *Powers* v. *Hotel Bond Co.*, 89 Conn. 143, 148, 93 Atl. 245, that our Act was undoubtedly passed with full knowledge of other similar Acts of common purpose; and we have thus recognized the fact that these Workmen's Compensation Acts have arisen out of an industrial condition common to all manufacturing communities, and in a broad sense were

intended to remedy a mischief common to all. It is therefore of some, though not of controlling, importance to observe what has been the course of legislation in other States and countries with respect to including occupational disease in Workmen's Compensation Acts. From an examination of the abstracts of forty foreign Workmen's Compensation Acts contained in the Bulletin of the United States Department of Labor issued in 1914 (No. 126), it appears that twenty-seven of them are on their face limited to injuries accidentally sustained, nine use the word injury without qualification, and four expressly mention both injury and disease. Out of the twenty-seven countries whose Compensation Acts are limited to injuries accidentally sustained, it is noted that four have separate Acts providing for workmen's sickness insurance. In this country, according to a Digest of Workmen's Compensation Laws published by the Workmen's Compensation Publicity Bureau of New York City in 1915, such Acts are in force in thirty-one States and two Territories, and there is also an Act of Congress covering employees of the United States government. Of these Acts, twenty are expressly limited to accidental injuries; fourteen use the term "personal injuries" without qualification, but of these, four expressly exclude disease except as it results from injury. None of them expressly include disease. Evidently, the general course of legislation abroad and in this country has been to deal with industrial accidents as a subject separate and distinct from occupational disease.

Of the ten Acts in this country which do not on their face exclude occupational disease, two have been authoritatively construed to exclude it. *Industrial Commission* v. *Brown*, 92 Ohio St. 309, 110 N. E. 744; *Adams* v. *Acme White Lead & Color Works*, 182 Mich. 157, 148 N. W. 485. The California Act has received a similar

administrative construction. Decisions of the Industrial Accident Commission of California, Vol. 1, No. 5, p. 11. On the other hand, the Massachusetts Act has been construed to include occupational diseases. *Hurle's Case,* 217 Mass. 223, 104 N. E. 336; *Johnson's Case,* 217 Mass. 388, 104 N. E. 735. The Act of Congress has been similarly construed by the solicitor of the Department of Labor, reversing a former ruling on that subject. *In re Jule,* Op. of Sol. of Dept. of Labor, p. 261 (April, 1915). Thus, among what may be called the doubtful States, the preponderance of opinion, so far as any has yet been expressed, seems to be against importing occupational diseases into Workmen's Compensation Acts by the process of judicial construction.

Turning now to the history of our own Act, the first affirmative action taken by the General Assembly was the passage of a resolution in 1911 providing for the appointment of a commission "to investigate and report to the next session of the General Assembly upon the legality, advisability, and practicability of establishing a state insurance department, or other form of state insurance, as a means of providing compensation for workmen and others injured through accidents occurring in industrial occupations." The commission appointed pursuant to this resolution presented its report, entitled "The Report of the Connecticut State Commission on Compensation for Industrial Accidents, to the General Assembly of 1913," and the bill recommended by the commission was limited to compensation for "personal injuries from any accident arising out of and in the course of his employment." Several other bills, including one representing the views of the association of manufacturers, and another the views of the state federation of labor, were presented to the General Assembly. None of them made any reference

to occupational disease, and in the course of many days of committee hearings reported and filed with the State Librarian, we find no reference to occupational disease and none appears in the bill as finally adopted or in the amendments of 1915.

It follows that if we construe the Act as covering compensation for death or incapacity arising from occupational disease we shall introduce into it a most important subject, which, so far as we can ascertain from the public documents, was not considered by the legislature in this connection. In fact the economic importance of the inclusion of disease in an Act which contains no special provisions on the subject, can hardly be estimated.

In the absence of any definition of occupational disease, the Act would include all diseases arising out of and in the course of the employment, and the word injury, if it includes the contraction of disease, includes also the aggravation of disease. So construed, our Act might almost be said to give compensation for the common fate of all who work because they must. The result would be to increase very greatly the cost of compensation insurance, and might either discourage the acceptance of the Act by employers or make it difficult for any but the young and strong to obtain employment. It may be added that in Germany, and, so far as we know, in other countries where a comprehensive scheme of workmen's sickness insurance is in force, the workman is required to contribute toward the cost of the insurance. We ought not to import into the Act by construction a subject-matter carrying such possible consequences, unless convinced that the General Assembly, notwithstanding its omission to refer to the subject, actually intended to include it.

It seems more reasonable to suppose that in framing an elective system of compensation for the employer

and the employee to accept or reject, the General Assembly should attempt to state the essential conditions of the bargain in terms, so that the parties could understand the consequences of their election. And when we find in such a statute, and in the legislative proceedings leading to its adoption, no mention of so important a subject as industrial sickness insurance, the reasonable inference is that the General Assembly probably did not intend to include the cost of such insurance in the proposition which it submitted to employers for their acceptance.

This seems still more probable, because it appears from chapter 14 of the Public Acts of 1913, p. 1634, entitled "An Act concerning Reports of Occupational Diseases," that the General Assembly had the subject of occupational disease under consideration at the very time when the Workmen's Compensation Act was pending before it; and the action which it took in respect of that subject was to require physicians to report cases, not to the compensation commissioner of the district, but to the commissioner of the bureau of labor statistics. This would indicate that the General Assembly intended to deal separately and at some future time with the subject of occupational disease.

There are, moreover, certain matters of important detail which one would naturally expect to find in a Compensation Act dealing with occupational disease, and which are not found in our Act. In the first place, the causal relation between disease and employment cannot as a rule be satisfactorily established except by expert testimony, which is likely to be beyond the reach of the claimant. In this connection the following extract from the decision of the commissioner is pertinent: "As pointed out by Dr. W. Gilman Thompson in the pioneer work in this country on occupational diseases, published only within the last few months,

'occupational diseases are not new diseases from the ultimate pathological standpoint' (page XXIV). He illustrates this by noting that the arterio-sclerosis or chronic nephritis produced by lead poisoning does not differ from that condition when induced by alcoholism or other toxic causes, and he further instances the case of bone necrosis from phosphorus poisoning, which he states does not differ from necrosis of other origin. . . . As said by Professor Thompson again it may be 'claimed that the workman is the victim of chronic lead poisoning; but are his arterio-sclerosis and nephritis due exclusively to lead poisoning, or are alcohol, syphilis or gout the underlying causes? Is his neuritis due to arsenic or alcohol?'. . . Was he tuberculous before he undertook work in a pottery, or did his work contribute to the disease? . . , Are his chronic bronchitis, anemia and malnutrition due to chronic gas poisoning acquired as a garment presser, or are they due to defective hygiene at home, poor food, lack of exercise, and the strain and anxieties of poverty? Such are the types of questions which constantly arise in connection with occupational diseases.' (Thompson, pp. 48 and 49.)" If the General Assembly intended to include occupational diseases in the Act, some way would doubtless have been provided in which a claimant could get the expert evidence necessary to prove that the disease arose out of the employment.

There are other difficulties which this Act does not pretend to meet. Take the case of death or incapacity resulting from an occupational disease gradually acquired while at work for different employers. Should the last employer bear the whole burden? Again, suppose an employer, or his insurer, undertakes to protect himself by having his workmen inspected at stated intervals and by discharging those who seem likely to become incapacitated from disease. Would

not some provision have been made to prevent the industry from thus escaping the burden of the disease which it creates? Indeed, the principle of holding an employer for the consequences of disease caused by the employment does not fit very well into our Compensation Act, for it is inconsistent with the unrestricted right to terminate the obligation by discharge, and it is also inconsistent with the unrestricted right of the employer to revoke his acceptance of the Compensation Act at any time, and in respect of any employee, as provided in § 3 of Part B. Public Acts of 1913, Chap. 138, p. 1737. It seems very unlikely that the General Assembly, if it intended to include compensation for industrial disease in the Act, should have passed over these matters in silence, and should have constructed the Act on the theory that adherence to the compensation scheme was a contract between the employer and each individual employee, which either party could terminate at will.

The points to which attention has been called were well understood by students of the subject, for in 1906 the English Act was amended so as to include for the first time "industrial diseases." Section 8, subsection 1, of the amended Act, includes provisions for determining what are "industrial diseases," for the impartial expert determination of the cause of the disease by certifying surgeons appointed for that purpose, for the equitable distribution of the award among several employers in cases of progressive diseases and shifting employment, and for recoveries within a limited time after discharge or suspension from employment when the death or incapacity arose from such employment. As this English Act was doubtless before the committee of the General Assembly, the omission of all of its provisions which were specially adapted to deal with the subject of occupational disease, is of great importance as affecting the question of probable legislative intent.

On the other hand, it may be said that the omission of the words "by accident," which in the English Act qualify the words "personal injury," is also of great weight; and the Massachusetts court so considered it in construing their own Act, saying that the term "personal injury" was an inclusive term, and that the omission of the qualifying words "by accident" were intended to enlarge the meaning of the term injury. *Hurle's Case*, 217 Mass. 223, 104 N. E. 336. That was a fair argument as applied to the Massachusetts Act, for the corresponding sections of the English Act and the Massachusetts Act are similar in form except for the omitted words; the Massachusetts Act reading as follows: "If an employee . . . receives a personal injury arising out of and in the course of his employment, he shall be paid compensation," etc. The words "personal injury" are here coupled directly with the grant of compensation, without any qualification direct or indirect. But that is not so in our Act, of which § 1 of Part B (Public Acts of 1913, Chap. 138, p. 1735) reads thus: "When any persons in the mutual relation of employer and employee shall have accepted Part B of this Act, the employer shall not be liable to any action for damages on account of personal injury . . . arising out of and in the course of his employment or on account of death resulting from injury so sustained; but the employer shall pay compensation on account of such injury in accordance with the scale hereinafter provided," etc. This language was not changed by the amendment of 1915. Public Acts of 1915, Chap. 288, p. 2115. Obviously the word "injury" is not left without qualification in our Act. Compensation is given for "such injury," and the reference is to injuries in respect of which the employer is exempted from actions for damages because of the mutual acceptance of Part B of the Act. The only other place in the Act where

the phrase "personal injury . . . arising out of and in the course of his employment" is found, is in Part A of the Act, dealing with the employer's liability at law, and the context there is as follows: "*Defenses abolished*. In an action to recover damages for personal injury sustained by an employee arising out of and in the course of his employment, or for death resulting from injuries so sustained, it shall not be a defense," etc. It cannot make any substantial difference in the construction of the term "injury" as used in that context, whether the words "by accident" are inserted or omitted.

This is the crucial point in the literal interpretation of our Act. The injury to be compensated is not defined except by the words "such injury," meaning, as the context says, a personal injury arising out of and in the course of the employment in respect of which the employer is exempted from actions for damages in case of the mutual acceptance by employer and employee of Part B; and in respect of which he is to be deprived of his so-called common-law defenses unless he does accept Part B. The point is not merely a verbal one. The Act is in form elective. In Part A it takes away the employer's common-law defenses, and in Part B it offers him a compensation scheme whose disadvantages are more or less nicely balanced against the alternative of facing common-law actions for damages with a crippled defense. It was quite to be expected that the compensation scheme should cover the same ground as the common-law action for damages, and the language of the Act was, we think, plainly intended to accomplish that result.

Since the common-law action for damages, which was founded on the master's negligence, never attempted to cover the typical case of an occupational disease caused by continued exposure to the ordinary and known risks

of the employment, the inference is plain that the alternative compensation scheme was not intended to cover such diseases. As already pointed out, the Act, because of its entire omission to refer to the subject, must include all diseases arising out of and in the course of the employment, or none. And if it was not intended to cover the typical occupational disease, it was clearly not intended to cover any except such as are the direct result or natural consequence of an accidental injury.

Finally, and notwithstanding the discussion on that point contained in *Hurle's Case,* 217 Mass. 223, 104 N. E. 336, the term "personal injury," as used in common speech, especially in connection with actions for damages, is more often intended to exclude disease than to include it. It is evidently not used in this Act in the legal sense which would include a libel or the seduction of a minor daughter, but in the popular sense of a bodily injury sustained while in the course of the employment; and in § 20 the phrase "reports of accidents" is used as synonymous with "reports of injuries."

Other language of the Act also lends countenance to the view that the injuries contemplated by the Act were those resulting from a definite occurrence which could be located in point of time and place. Section 7 as amended (Public Acts of 1915, Chap. 288, § 3, p. 2117) provides that any "employee who has sustained an injury in the course of his employment shall forthwith notify his employer"; dependency is to be determined as of the time of the injury and not as of the time of the resulting incapacity; the average weekly wage is to be calculated with reference to the "twenty-six calendar weeks immediately preceding that during which he was injured"; compensation for fatal injuries is given only when death results within two years "from date of injury"; the notice required by § 21 as amended

in 1915 must be given within one year from the date of the injury, and state "in simple language the date, place, and nature of the injury." These are some of the statutory conditions upon which the compensation or its amount is made to depend, and they are not workable on the assumption that the word injury was intended to include disease, because it is notorious that the typical occupational disease is not an injury which can be said to have been "sustained" at a given date. If, for the purpose of escaping this difficulty, it is attempted to substitute the date of the incapacity for the date of the injury, it will be necessary to repeal and reconstruct a considerable portion of the Act.

It may be said that in point of logic, occupational disease is as proper a subject for compensation as industrial accident. Upon that point we express no opinion, except such as we have already intimated. It is certain, however, that the opinions of to-day on that subject are more advanced than those of 1913, and that occupational disease was generally recognized, and by the same General Assembly specifically recognized, as a subject presenting its own separate problem. The Workmen's Compensation Act was our first legislative experiment in substituting collective justice regardless of fault, for justice between individuals based upon compensation for legal wrong; and it may be doubted whether the General Assembly of 1913 could have been pushed to the point of including occupational diseases in that experiment.

That, however, is not the question before us. We have only to determine whether the General Assembly, notwithstanding its failure to expressly include the important subject of occupational disease in the Act, intended to include it under the words "personal injury . . . arising out of and in the course of his em-

ployment," and for the reasons indicated we infer that it did not so intend.

There is error, the judgment is set aside and the cause remanded to the Superior Court for the rendition of a judgment vacating the award of the compensation commissioner.

In this opinion PRENTICE, C. J., THAYER and ROR- ABACK, Js., concurred.

WHEELER, J. (dissenting). The personal injury for which an employee may recover compensation under our Act, is one "arising out of and in the course of his employment." Whether the injury is such a one is a question of fact for the decision of the compensation commissioner. The court may review his conclusions only when the subordinate facts are legally inconsistent with the conclusion. *Powers* v. *Hotel Bond Co.*, 89 Conn. 143, 93 Atl. 245. In this case the claimant had worked in a room in which fumes from molten lead arose, and on the floor and throughout the room were particles of lead, and as a consequence he contracted lead poisoning, which may have developed three days after his employment had begun. The conclusion that this disease arose in the course of and out of the employment is uncontested.

The appeal assigns error in the ruling of the commissioner in awarding compensation for the injury suffered, viz., the disease of lead poisoning. The employer admits that disease consequent upon accident may fall within the Act. It denies that a disease, not the accompaniment or result of an accident, can, under our Act, be the subject of compensation. In short, it maintains that occupational diseases are not compensable under the Act. The decision of this question depends upon the construction of certain terms of our Act; and we

have decided that its provisions should receive a liberal construction. *Powers* v. *Hotel Bond Co.*, 89 Conn. 143, 93 Atl. 245. This method of construction accords with the legislative intent, for an eminent authority has pointed out that our Act includes within its protection a greater number of employees than any Act adopted by any State, with the single exception of New Jersey, and this number he has estimated at ninety per cent of all our employees.

There are two great divisions of industrial hazard, injuries through accident and injuries through disease. Certain diseases result from certain kinds of industrial occupation, and hence has arisen the term occupational disease; that is, disease arising from the nature, circumstances or conditions of one's employment. One of our large life insurance companies has printed and now distributes a pamphlet for the prevention of disease, in which it says: "A great many more men die of industrial tuberculosis than are killed in mine fires and boiler explosions, with railroad collisions thrown in." Scientific men have apparently accepted this statement. Among occupational diseases lead poisoning is always prevalent in industries where lead is used. Authorities concur that it is the most prevalent of the industrial poisons, although its prevention in large part is a comparatively simple task where employer and employee work together for this common end.

The compensation principle was originally confined to injuries caused by accident. The cost of the injury to the employee through accident was placed upon the same basis as the injury to machinery and plant. Each was to be figured in as a part of the overhead charge. The compensation law made the cost in life and limb, as well as the injury to machinery or plant, a charge upon the industry rather than upon the sufferer through accident, or the sufferer's family. Our Act was passed

in 1913, many years after the first Compensation Act originated in Germany. The same reasons, economic and humanitarian, and the desire to do better social and individual justice, impelled its passage with us, as with the countries of Europe and the several States of the Union and the Federal Government which had already enacted such a law. No sound reason, and no sound public policy, has been or can be suggested which would protect the victims of accident from modern industrialism and leave unprotected the victims of disease; and when courts and commissions have decided that disease was not within a Compensation Act under consideration, not infrequently the admission has been made that it ought to be there; and we heard the same admission in the most excellent oral argument of the respondent's counsel and read it in their brief. It is true, incapacity resulting from an occupational disease should be compensated as freely and fully as an injury to the person resulting from physical violence, when both arise in the course of and out of the employment. But our concern is not with the wisdom or economic justice of our statute (chapter 138 of the Public Acts of 1913 as amended by chapters 287 and 288 of the Public Acts of 1915), but with its meaning.

My brethren say the real issue in this case is whether we shall introduce the subject-matter of industrial disease into our Act by judicial construction, when the Act does not specifically mention this subject. The Act does not mention industrial accidents, yet the court by judicial construction ascertains that the term personal injury includes only injuries arising through accident, while I, by judicial construction, find the same term to include all injuries, whether arising from accident or disease. Therefore our immediate question is, does the term "personal injury" include an occupational disease? Most Compensation Acts, existent when

our Act was passed, provided for recovery for personal injury caused by accident, or injury by accident, or accidental injury; a few for personal injury, or injury. In determining whether occupational disease was within the terms of their Act, some courts and commissioners have advanced certain arguments general to a discussion of this question under most Acts, which it may be well to take up at the inception of our discussion.

The Ohio commission, and counsel for this respondent, express the fear, shared by our own court, that if "personal injury" is construed to include disease the door will be open to claims for compensation for every disease incurred in the course of the employment. This may have been so under the Ohio Act, which did not provide that the personal injury should arise out of the employment. It is not a just criticism of our Act, for that expressly limits recovery to "personal injury sustained by an employee arising out of and in the course of his employment." No industry, under our Act, can be charged with the duty of compensating any injury which does not result to its employee in the course of the employment and does not originate in it. I am unable to see the force of the statement that fraudulent claims of disease will flourish, and that the last employer must suffer for the industrial injuries occurring under other employers. The limitations of our Act confine payments by any industry for that part of the injuries arising in that industry, and the course of justice in our courts in coping with all manner of fraudulent claims strips the suggestions of our inability to deal with such of all merit. The Ohio court anticipated, as does this respondent, a serious injustice in that the insurance premiums have been based upon the theory of accident, and not disease as well as accident; and our own court fears that this construction of "injury" would impose a heavy burden of insur-

ance upon the employer. There is no finding of this in our record, and we should not take judicial notice of facts of this character. If it were a fact found, the apparent hardship would not affect the construction of these words, since every one is presumed to know the law, and hence no legal hardship can arise from compelling its observance. Moreover, industry would soon adapt itself to a condition it had not anticipated, and the consumer would ultimately pay the increased cost, if any. But it would seem that the apprehension of the court of disaster to the employer or the insurer is somewhat unnecessary, if the Massachusetts Industrial Accident Board is a safe guide. In its first annual report in 1914 of industrial injuries, it found that out of twenty-nine thousand seven hundred and thirty-seven nonfatal cases one tenth of one per cent were occupational diseases.

Our court says that certain provisions of the Act show that the injuries contemplated by the Act were those resulting from a definite occurrence, and that these provisions are not workable if injury includes disease, since the date of an occupational disease cannot be determined. None of the provisions referred to contemplate that the injuries of the Act result from definite occurrences; all do contemplate a time when the injury occurs. This is one of the reasons advanced by the Ohio court, and it has been a common criticism by the advocates of a restricted Compensation Act. One is afflicted with a disease when there is such an alteration of the state of his body or any of its organs as to prevent or disturb the performance of any of the vital functions of his body. Webster's New International Dictionary.

There is no practical difficulty in fixing the date of an occupational disease. They all have marked characteristics. In the daily round of duty the trial judge

and the jury are constantly meeting and overcoming the same difficulties. If the proof shows good health prior to the employment, the existence of the disease, the date when first noticed, and its probable beginning with reference to this, no other known cause than the occupation, and that a probable cause, it may be found whether the disease did arise in and out of the employment. Every just case is susceptible of such proof, and the conclusion to be drawn from proof of this character is not so uncertain as to be untrustworthy.

The term "personal injury" as found in the statute is used to indicate "the object of the hurt, rather than the subject of the legal injuria." It does not here designate the Act or omission which harms or damages another, but the harm or damage done to the person. *Carstesen* v. *Stratford*, 67 Conn. 428, 437, 35 Atl. 276. An injury to the person may logically and legally include disease, whether occupational or otherwise. This accords with all the definitions of the lexicographers; and has been conceded by practically all the jurists and commissioners who have considered or defined the term. Although the opinion states the contrary, I share the view of the Massachusetts court and of jurists who have expressed an opinion upon this point, that this construction harmonizes with the ordinary use of language.

General Statutes, § 1, directs that "in the construction of all statutes of this state, words and phrases shall be construed according to the commonly approved usage of the language." A law which provides compensation for the victims of industrial disease as well as those of industrial accident is infinitely more humane than one which limits its beneficence to the victims of accident. Every reason for protecting the one class of injured applies equally to the other. Limiting personal injury to those arising from direct bodily violence limits the

term to injuries of accidental origin. It practically adds to this term "caused by accident," or "resulting from accident," or "accidental," or words of similar import. Doubtless the legislature might have used this term with this meaning, and it might be possible to find from the other portions of an Act that this use was so intended. The Michigan Act is an instance where an inspection of other terms of the Act shows clearly that "personal injury" was intended to refer only to accidental injury or injury caused by accident. There must then be read into our Act words signifying either that the injury was accidental or caused by accident, if we are to exclude disease or occupational disease.

Let us examine our Act with a view to ascertaining whether the intent of the Act was to speak contrary to the humane and natural construction. The General Assembly might have expressly included disease, but why should it, if it used a general term which naturally included it? Or it might have added to the term "personal injury" "accidental" or "caused by accident." And why should it not, if it intended to restrict the natural meaning of this term? When our statute was passed, twelve States and the United States had passed Workmen's Compensation Acts. In eight States and in England the term personal injury or injury was qualified by, "caused by accident," "by accident," "accidental," or equivalent phrase. In Massachusetts, Michigan, and Ohio, and the Federal statutes, "personal injury" or "injury" was used without qualification. In Washington, "injury" or "injured" was by definition limited to fortuitous events, as distinguished from the contraction of disease. The British Act had made use of the term with the qualification, "caused by accident." The British court had defined accident as an unlooked for mishap, or an untoward event not expected or designated, hence it was held that it must

have occurred at a particular date, and so a personal injury of this character was plainly distinguishable from a disease of gradual growth whose exact beginning might be unknown and uncertain. *Fenton* v. *Thorley & Co., Ltd.,* L. R. (1903) App. Cas. 443, 5 W. C. C. 1; *Steel* v. *Cammell, Laird & Co., Ltd.,* L. R. (1905) 2 K. B. Div. 232, 7 B. W. C. C. 482. A disease not attributable to accident by means of a definite event, was held in England not to be within the term personal injury. *Eke* v. *Hart-Dyke,* L. R. (1910) 2 K. B. Div. 677. And in *Trim Joint District School* v. *Kelly,* L. R. (1914) App. Cas. 667, Lord Chancellor Haldane held that injury by accident meant nothing more than accidental, and that accident included any injury which was not expected or designed by the workman himself. Judicial expression in America upon this term followed the English authority, and our General Assembly had before it both the English and the American interpretation of those terms. In 1906, as a consequence of the decision of *Steel* v. *Cammell, Laird & Co., Ltd.,* L. R. (1905) 2 K. B. Div. 232, the English Act was amended so that certain named diseases, and others which might from time to time be included by the secretary, should be entitled to compensation as if the disease was a personal injury by accident. 6 Edw. VII, C. 58, § 8 (6).

In the Federal statute of 1908, compensation was awarded "to the employee injured." In Massachusetts, Ohio, and Michigan, it was awarded for "personal injury." But in Michigan other parts of the Act were later held by its Supreme Court (*Adams* v. *Acme White Lead & Color Works,* 182 Mich. 157, 148 N. W. 485) to clearly indicate that personal injury was confined to those of accidental origin. At the passage of our Act the Michigan Industrial Board had ruled that "personal injury" included injuries by disease; the Ohio Board had denied a recovery for an occupational disease, while

the Massachusetts Committee of Arbitration had ruled in the *Johnson Case* that an injury from lead poisoning was compensable under their Act, and this ruling was affirmed by the Supreme Court. 217 Mass. 388, 104 N. E. 735. None of the courts of last resort of these States, and none of the Federal courts, had passed upon the immediate question.

Our Compensation Act was preceded by much investigation and study by our General Assembly and by commissioners authorized by it. Both the General Assembly and the commissions had before them, prior to the enactment of the Act of 1913, the legislation in England and some of the countries of continental Europe, and that of our States and the Federal Congress; and they knew the interpretation which had been put upon these Acts. With this history of compensation legislation before it, it seems a reasonable and unescapable conclusion that the General Assembly would have coupled with the term "personal injuries" something to indicate that these were confined to those of accidental origin had it so intended. It knew the course of English decision and the controversy there over the attempt to include in its Act occupational diseases, and the amendment of their Act induced by the decision denying the right of recovery for an occupational disease. It knew the settled construction given these terms of common use in the several compensation statutes limiting recovery to injuries of accidental origin. And yet it chose to use the term personal injury without qualification when it also knew that the use of this term would naturally invite a construction including within it disease. And it did this when it knew that the claim had been made and sustained, that personal injury, as used in a similar statute, did include disease.

With this knowledge the General Assembly made no distinction, at least in words, between industrial in-

juries from accident and those from disease, and even excluded from the title and body of the Act the word "accident" and "accidental." Their action is pregnant with significance, and tends strongly to indicate that the General Assembly did not intend to limit injuries to those of accidental origin. Agitation of this general subject began as early as 1907. A committee was authorized by our General Assembly to investigate and recommend legislation to regulate the liability of employers for accidents to employees. It reported and was continued with power, and in 1909 reported in favor of an employers' liability bill in part and against a compensation bill. In 1911 the Senate passed a compensation bill, which the House rejected, and the Senate also passed a substitute bill, which the House rejected. Each of these bills in terms confined the subject of compensation to personal injuries from accident arising in the course of and out of the employment. Later on in the session a commission was authorized to investigate State insurance as a means of providing compensation for workmen and others injured through accidents occurring in industrial occupation. The commission reported in 1913, recommending a compulsory Compensation Act applying to certain named hazardous employments, and providing for compensation to any workman who should have received personal injury from any accident arising out of and in the course of his employment in any such trade or occupation. The commission attached a proposed bill, which in its title and terms was limited to compensation for injuries from accident. This bill was introduced in the Senate, and failed of passage. Up to this time every report made to the Governor or General Assembly and every bill introduced in the General Assembly had related to injuries from accident. The limitation to injuries from accident—a

term recognized and defined in the law of compensation—was a sufficient exclusion of the sufferers by disease from the benefits of the Act.

A substitute for the commission bill was passed by the Senate and House in May, 1913. The Act is a voluntary instead of a compulsory Act, and is not confined to hazardous occupations. It is in essentials and form a radically different Act from the commission bill. It does not follow in its entirety any one of the three bills then before the General Assembly. It was framed by the committee and it borrowed very largely from the Massachusetts Act; and it left out "by accident," in all probability for the same reasons that induced Massachusetts to leave them out. Neither in the title nor in the body of the Act (chapter 138 of the Public. Acts of 1913) is the word accident or accidental used. The recovery is for personal injuries, or injuries. Why was this marked change made in this Act? Does it not exhibit a clear intent not to limit personal injuries to those caused by or arising from accident? In one place in the Act we find the word "accident" used: in the heading of § 20 appears "Reports of Accidents." The failure to eliminate "accidents" and substitute "injuries" was, I think, very clearly an oversight. This is shown by the practical construction placed upon it by the compensation commissioners. In Bulletin 5, issued under their direction, this heading is omitted. And it is shown by the action taken in reference to the title of this Act. The title of the printed Act differs from the title of the original Act as passed and on file in the secretary's office, and this difference is conclusive of the legislative intent. The title of the original Act appears as follows: "An Act concerning Compensation for Injuries by Industrial Accidents to Workmen injured in the course of their employment." The words "for Injuries by Industrial Accidents" have a line drawn

through them, and in their place are the words "to Workmen injured in the course of their employment." Throughout this Act there is no word or expression which in slightest degree points to the use of the words "personal injuries" in any narrow or restricted sense. Indeed, we find certain injuries specified as deemed to cause total incapacity, and others as deemed to cause partial incapacity, and entitled to a named compensation. Confessedly some of these named injuries may be caused by disease as well as accident, and the Act makes no attempt to exclude them from its provisions. Since the passage of our Act the Massachusetts court has construed the term "personal injuries" as found in its Act. In the body of that Act are found several references to accident and accidental; despite these, the court decided that the words did include disease in a case where the injury from the inhalation of poisonous gases resulted in a workman's blindness. *Hurle's Case,* 217 Mass. 223, 104 N. E. 336. Following this case the court held lead poisoning within the term "personal injury." *Johnson's Case,* 217 Mass. 388, 104 N. E. 735; *Madden's Case,* 222 Mass. 487, 491, 111 N. E. 379, 380. The Massachusetts court has definitely decided that occupational diseases are included within this term of its Act. These decisions were subsequent to our Act of 1913. The Federal Act of 1908 (35 U. S. Stat. at Large, p. 556, Chap. 236, § 1) provided compensation if the employee "is injured in the course of such employment." Other sections of the Act refer to accident. The Federal advisers first construed the Act to include injury from disease. Later they advised that the injuries to be compensated were those arising from accident. *In re Sheeran,* Op. of Sol. for Dept. of C. & L. p. 169; *In re Schroeder,* Op. of Sol. for Dept. of C. & L. p. 172. The last case was one of lead poisoning. These last rulings prevailed when our Act was adopted.

Afterward these opinions were, as I understand, overruled in several cases, beginning with *In re Jule*, Op. of Sol. for Dept. of Labor, p. 261. This interpretation of the Federal statute prevailed when the amendments of 1915 were made to our Act. In Michigan, as I have pointed out, the term "personal injury" was by other terms of the Act limited by necessary implication to those caused by accident; and after the passage of our Act it was so held in *Adams* v. *Acme White Lead & Color Works*, 182 Mich. 157, 148 N. W. 482—a lead poisoning case,—reversing the decision of the Michigan compensation board made prior to our Act. In Ohio the industrial board had denied the claim of a recovery for disease.

In this condition of the authorities it is highly improbable that the General Assembly made use of the term "personal injury" with the intention of limiting it to injury caused by accident, without connecting this term either expressly or by necessary implication with the word "accident" or "accidental."

The General Assembly enacted, chapter 14 of the Public Acts of 1913, that physicians should report all occupational diseases to the labor commissioner. The Act was a preventive one, the report was required to be made to the official having the supervision of our manufacturers, with the plain purpose of taking in season preventive measures to check these forms of disease. The subject of occupational disease was also before the General Assembly in our proposed constitutional amendment and in House bill 94, which provided that the term "personal injury by accident shall in no case be construed to include occupational disease in any form," etc. The court, I believe, is in error in assuming that neither judiciary committee nor General Assembly considered this subject. The judiciary committee and the General Assembly made use of the

term "personal injury" with full knowledge that it had been construed to include occupational disease, and that others had felt that it was necessary to define the term "personal injury," or to exclude from it occupational disease, if such was the intent.

The court says it cannot make any substantial difference, in the construction of the term "injury" as used in our Act, whether or not it is qualified by the words "by accident," since the injuries compensated for by the Act are those "in respect of which the employer is exempted from actions for damages in case of the mutual acceptance by employer and employee of Part B" of the Act. And the opinion concludes this part of its discussion by the assertion that "it was quite to be expected that the compensation scheme should cover the same ground as the common-law action for damages, and the language of the Act was, we think, plainly intended to accomplish that result." I prefer to think this to be an inadvertence in the court's argument, for it is in direct variance with our recent decisions and ignores or misconceives the underlying principle of our Compensation Act, and indeed of all Compensation Acts. "Fault is the foundation of the tort action: compensation for the injury regardless of the fault, of the Compensation Acts." *Powers* v. *Hotel Bond Co.*, 89 Conn. 143, 146, 93 Atl. 245. "In principle it is the payment of the employer's share of a common loss in a common undertaking." The injuries compensated by the Act are not only those for which an action lay under the common law, but all injuries "arising out of and in the course of" the employment of the injured.

Nine States, in 1913, and 1914, passed Compensation Acts which limited the injuries compensated to those arising from accident, or accidental. Two other States, in their Acts, expressly excluded disease from the per-

sonal injuries to be compensated. In 1915 our Act was amended in a number of important particulars, borrowing in part from the English and largely from the Massachusetts Act, and presumably with the knowledge of the construction of these provisions by the English and Massachusetts courts, and with, as we must presume, the knowledge of the action taken by other States, the array of States limiting injury or personal injury to those from accident, and two of the States expressly excluding disease as a subject of recovery, with the condition of the authorities in States which had made use of this term as in our Act uncoupled with accident, and especially with the Massachusetts decisions. The Massachusetts court, in *Hurle's Case* (217 Mass. 223, 104 N. E. 336) and in *Johnson's Case* (217 Mass. 388, 104 N. E. 735) had decided, in 1914, that personal injury did include occupational disease. With all this knowledge our General Assembly did not add to or vary this term, or attempt to. In this course I find strong reason for my belief that the General Assembly intended that personal injury should not be limited to injuries from accident, and did not intend to exclude disease. I shall not stop to consider the course of legislation in other jurisdictions since the adoption of the amendments of 1915, for they will not aid me in ascertaining what the General Assembly intended by the Act of 1913, or by its amendments of 1915.

I have referred, with a single exception, to the principal arguments advanced by the Michigan court and the Ohio court and industrial commissions in support of their view, omitting argument based upon the history of their Acts and the interpretation based upon consideration of their entire Act. That exception is the assertion of the Michigan court (*Adams* v. *Acme White Lead & Color Works*, 182 Mich. 161, 148 N. W. 485) and the Ohio commission, that under the common

law no recovery can be had for loss from an occupational disease. The Ohio commission conceded that had recovery for occupational diseases existed at the date of their Act, the term "personal injury" might be construed to include disease. Recovery for injury suffered prior to our Act was based on fault. Assuming the negligent causing of disease to an employee without his concurring fault, our common law gives a remedy, and in this our law does not differ from the common law of other jurisdictions. In the case of *O'Keefe* v. *National Folding Box & Paper Co.*, 66 Conn. 38, 45, 33 Atl. 587, an attempt was made by the plaintiff to recover for an injury resulting from the vaporization of poison from the paper he was handling entering his system. Clearly this was an occupational disease. We held that the complaint was defective in its statement of the cause of action, but we recognized the existence of such a cause of action when properly stated, as is shown on page 45. The instances where this precise point has been determined are comparatively infrequent, and this is probably due to the fact that the employee's recovery was barred by his assumption of the risk. We know of no case holding, with the Michigan case, that injury through disease due to fault to which the sufferer has not materially contributed is remediless under the common law. Examples of a contrary holding are: *Hurle's Case*, 217 Mass. 223, 104 N. E. 336, and cases cited; *Thompson* v. *United Laboratories Co.*, 221 Mass. 276, 108 N. E. 1042; *Corcoran* v. *Wanamaker*, 185 Pa. St. 496, 39 Atl. 1108; *Pinkley* v. *Chicago & E. I. R. Co.*, 246 Ill. 370, 92 N. E. 896; *Canfield* v. *Iowa Dairy Separator Co.*, 172 Iowa, 164, 154 N. W. 434; *Scott* v. *Simons*, 54 N. H. 426; *Cesar* v. *Karutz*, 60 N. Y. 229; *Alston* v. *Grant*, 3 El. & Bl. 128.

In this connection the court say: "Since the common law action for damages, which was founded on the

master's negligence, never attempted to cover the typical case of an occupational disease caused by continued exposure to the ordinary and known risks of the employment, the inference is plain that the alternative compensation scheme was not intended to cover such diseases." Again I prefer to think this is an inadvertence in the argument, for it assumes that the Compensation Act was a substitute for the common-law action for damage suffered through a master's negligence, and the contrary is elementary in the consideration of a Compensation Act. And this court has so decided. *Bayon* v. *Beckley*, 89 Conn. 154, 93 Atl. 139; *Powers* v. *Hotel Bond Co.*, 89 Conn. 143, 93 Atl. 245; *Kennerson* v. *Thames Towboat Co.*, 89 Conn. 367, 94 Atl. 372.

There is no case except the Ohio case, *Industrial Commission* v. *Brown*, 92 Ohio St. 309, 110 N. E. 744, which holds that the term "personal injury" in a compensation statute, when disassociated from accident or accidental, does not include injuries from disease as well as accident. And it is apparent that this decision was reached by finding the legislative intent in the history of the Act, past and future, and in contemporaneous construction by those charged with its execution. It is worth noting that the denial of recovery by the industrial commission was reversed by the trial court, whose decision was sustained by the appellate court, and that decision was in turn reversed. 92 Ohio St. 309, 110 N. E. 744.

It is said the requirements of our statute exclude disease, since the employer is required to keep a record of the injuries sustained, and such report as the commissioner requires, to be made to him, of such as result in incapacity of one day or more, and that he must furnish medical aid as soon as he has knowledge of the injury. These provisions, it is said, cannot be followed in the case of injury from disease, unless the employer keeps

watch over workmen reported sick. The shop gossip will make this care a negligible quantity. Then, too, every employer has access to the reports to the labor commissioner made by physicians of all occupational diseases, under chapter 14 of the Public Acts of 1913. But if we assume all that the respondent claims, is it not reasonable to think the General Assembly intended this very thing? Small employers of labor have always practiced this; and one of the developments of recent years has been the growing conviction of the large employers of labor, of the intimate relation between the extent of their production and the health of their employees. And this assumption of duty has come about not alone from economic but also from humanitarian motives. It has also been accelerated by the pressure of public opinion; and now one third of the States have enacted laws for the better protection, prevention and care of occupational diseases.

No duty will rest upon employer or employee, at least until the existence of the disease can be known by the exercise of reasonable diligence. I find nothing impractical in these provisions of our Act. If the respondent's suggestion be correct, that the existence of an occupational disease is a scientific question ill adapted to judicial determination, it is fortunate that our Act leaves the decision of this fact to a specially constituted administrative tribunal. If its suggestion be correct, that these cases will be poorly presented because so often of inconsiderable pecuniary moment, the Act is wisely framed in imposing the duty of investigation upon the commissioner—well met in this case, as the respondent points out, in the "careful and able memorandum" of the commissioner.

The opinion supports its argument by its assumption that proof of disease will be difficult and beyond the reach of a claimant. Hence it assumes the General

Assembly never intended to give the employee this remedy, else it would have provided a way of helping him prove it. When the General Assembly finds the worker incapable of handling a remedy of admittedly far-reaching beneficence to him, it will be time enough then for it to consider helping him find a way.

The opinion argues that our General Assembly never intended to include disease in "personal injury," otherwise it would have required the employee to help pay the increased cost of meeting this burden. The purpose of our Compensation Act was to help lift the burden from the worker and place it upon production. Our Act is not inconsistent; it does not seek to give with one hand, and take away with the other.

The opinion argues that the inclusion of disease as a personal injury will discourage the acceptance of the Act by the employer, and, if he accepts it, he will use his unrestricted right of discharge and of revocation of his acceptance to turn out the old and those liable to disease and keep only the young and strong.

I have too high an opinion of the Connecticut employer of labor to believe this. Similar forebodings were heard in the discussion preceding our Act, but time has stilled them all. The Act, generally, is approved of by the employers of the State. Argument such as this does not help us to find out the true meaning of "personal injury," and, if such argument should become converted into fact, relief to the worker would come through amendment of the Act, even to the substitution of a compulsory Act for our elective one.

I conclude, the term "personal injury," as used in our Compensation Act, means any harm or damage to the health of an employee, however caused, whether by accident, disease, or otherwise, which arises in the course of and out of his employment and incapacitates him in whole or in part for such employment.