ADAMS v. ACME WHITE LEAD & COLOR WORKS.

1. ACCIDENT—DEFINITION—MASTER AND SERVANT—WORKMEN'S COM-
PENSATION ACT—POISONING.
   An accident is an unforeseen event, occurring without the
   design or will of the person whose act causes it; it par-
   takes of the nature of an unexpected or unusual occurrence,
   brought about by some unknown cause, and involving some-
   thing fortuitous or unexpected; or, if the cause is known,
   having an unprecedented consequence.

2. MASTER AND SERVANT—ACCIDENT—PERSONAL INJURIES.
   Under the provisions of the workmen's compensation act, no
   recovery may be allowed for occupational diseases such as
   lead poisoning, which, being gradually acquired, is outside
   the scope of the requirement that notice is to be given
   within ten days after an accident, and of the title and terms
   of the statute as to compensating accidental injuries. Act
   No. 10, Pub. Acts Extra Session 1912 (2 How. Stat. [2d
   Ed.] § 3939 et seq.).

3. SAME—CONSTITUTIONAL LAW—TITLE OF STATUTE.
   If the act was intended to include such occupational dis-
   eases, the title was not broad enough to express that object
   within Art. 5, § 21, of the Constitution.

Certiorari to the industrial accident board to re-
view an award of compensation to Sarah E. Adams
against the Acme White Lead & Color Works for the
death of claimant's husband. Defendant brings cer-
tiorari. Submitted April 15, 1914. (Docket No. 44.)
Reversed July 25, 1914.

*Bowen, Douglas, Eaman & Barbour,* for appellant.

*Noble T. Lawson,* for appellee.

STONE, J. The questions involved in this case are
raised on certiorari to the industrial accident board.
On December 18, 1912, Augustus Adams, a resident
of Sandwich, Ontario, began work at the plant of the

Acme White Lead & Color Works in the city of Detroit. His duties were those of a sifter or bolter tender in the red lead plant. His work brought him in contact with the lead. On May 29, 1913, he left his work at the quitting time, but that evening became so ill that he was unable to return to work again. He died on June 27, 1913. There is no doubt that the cause of his death was lead poisoning, contracted industrially; *i. e.*, "was an occupational disease," as the return of the industrial accident board shows. The return states:

"That during said period between December 18, 1912, and June 27, 1913, one Augustus Adams was in the employ of the Acme White Lead & Color Works; * * * and that during said period, while in the course of said employment, he contracted an occupational disease, to wit, red lead poisoning, upon the premises of the said company, and that on June 27, 1913, he died as a result of said disease."

The claim of the widow, under Act No. 10 of the Public Acts of the Special Session of 1912, was duly presented to a committee of arbitration and allowed. Thereafter, in accordance with the provisions of said act, the respondent filed with the said board a claim for review of the decision of said committee on arbitration, and later, after a full hearing, the said board made and entered an opinion and order, denying the contention of the respondent, and affirming the award of said arbitration committee. The opinion of the said board, upon which its order was based, so fully presents the questions involved that we cannot do better than to quote therefrom. After referring to the facts above set forth, it is said:

"These facts are undisputed, and the sole question in the case is whether the workmen's compensation act covers the case of death by lead poisoning arising out of and in the course of the employment. It is contended on behalf of respondent as follows: (1) That lead poisoning is not an accident; (2) that Act No. 10,

Public Acts of 1912, was not intended to provide compensation for diseases, but only accidents; (3) if the act does apply to industrial diseases, it is so far unconstitutional.

"It seems to be established under the English cases that lead poisoning is not an accident. It is an occupational disease. It seems to follow from this that, unless the Michigan workmen's compensation law, is broad enough to include and cover occupational diseases, the applicant's claim in this case must be denied. The controlling provision of the act on this point is found in section 1 of part 2, and is as follows: 'If an employee * * * receives a personal injury arising out of and in the course of his employment,' he shall be paid compensation, etc. It will be noted that the above language does not limit the right of compensation to such persons as receive personal injuries by accident. The language in this respect is broader than the English act, and clearly includes all personal injuries arising out of and in the course of the employment, whether the same are caused 'by accident' or otherwise. It is equally plain that lead poisoning in this case, in fact, constitutes a personal injury, and that such personal injury was of serious and deadly character. The board is therefore of the opinion that the section of the Michigan act is broad enough to cover cases of lead poisoning, especially the one in question."

The board also reached the conclusion that it would not be justified in holding the part of the act referred to invalid, on constitutional grounds.

By the assignments of error, it is claimed that the board erred: *First,* in construing the said act so as to provide for the awarding of compensation for an occupational disease, specifically red lead poisoning; *second,* in overruling appellant's contention that, if in said act the legislature intended to provide compensation for an occupational disease, particularly red lead poisoning, said act, in so far as it does so provide, is unconstitutional.

1. Does the Michigan act include and cover occupational diseases? This is a fair question, and should

be fairly answered. What is an "occupation," or "occupational disease?" The Century Dictionary and Cyclopedia defines an "occupation disease" as "a disease arising from causes incident to the patient's occupation, as lead poisoning among painters." In the instant case the undisputed medical evidence shows that lead poisoning does not arise suddenly, but comes only after long exposure. "It is a matter of weeks or months or years." It is brought about by inhalation, or by the lead coming into the system with food through the alimentary canal, or by absorption through the skin. In any case it is not the result of one contact or a single event.

"In occupational diseases it is drop by drop, it is little by little, day after day for weeks and months, and finally enough is accumulated to produce symptoms."

It also appears that lead poisoning is always prevalent in the industries in which lead is used, and a certain percentage of the workmen exposed to it become afflicted with the disease. Elaborate precautions are taken against it in the way of instructions to the men, masks to protect the respiratory organs, etc. Whether the workman will contract it or not will depend upon the physical condition, care, and peculiarity of the individual; and the amount of time it will take to produce ill effects or death also varies.

An "accident" is defined in Black's Law Dictionary as follows:

"Accident. An unforeseen event, occurring without the will or design of the person whose mere act causes it; an unexpected, unusual, or undesigned occurrence; the effect of an unknown cause, or, the cause being known, an unprecedented consequence of it; a casualty."

It might be well to keep in mind the conditions sought to be remedied by the diverse workmen's com-

pensation enactments which have been adopted by several of the States of the Union and in foreign countries. The paramount object has been for the enactment of what has been claimed to be more just and humane laws to take the place of the common-law remedy for the compensation of workmen for accidental injuries received in the course of their employment, by the taking away and removal of certain defenses in that class of cases.

In this our own act is not an exception. It first provides that in any action to recover damages for personal injury sustained by an employee in the course of his employment, or for death resulting from personal injuries so sustained, it shall not be a defense: (*a*) That the employee was negligent unless and except it shall appear that such negligence was wilful; (*b*) that the injury was caused by the negligence of a fellow employee; (*c*) that the employee had assumed the risks inherent in or incidental to or arising out of his employment, or arising from the failure of the employer to provide and maintain safe premises and suitable appliances.

It is then enacted that the above provisions shall not apply to actions to recover damages for the death of, or for personal injuries sustained by, employees of any employer who has elected, with the approval of the industrial accident board thereinafter created, to pay compensation in the manner and to the extent thereinafter provided. Manifestly, the terms "personal injury" and "personal injuries," above mentioned, refer to common-law conditions and liabilities, and do not refer to and include occupational diseases, because an employee had no right of action for injury or death due to occupational diseases at common law, but, generally speaking, only accidents, or, rather, accidental injuries, gave a right of action. We are not able to find a single case where an employee has

recovered compensation for an occupational disease at common law. Certainly it can be said that in this State no employer has ever been held liable to the employee for injury from an occupational disease, but only for injuries caused by negligence. It seems to us that the whole scheme of this act negatives any liability of the employer for injury resulting from an occupational disease. The title of the act is significant:

"An act to promote the welfare of the people of this State, relating to the liability of employers for injuries or death sustained by their employees, providing compensation for the accidental injury to, or death of employees, and methods for the payment of the same, establishing an industrial accident board, defining its powers, providing for a review of its awards, making an appropriation to carry out the provisions of this act, and restricting the right to compensation or damages in such cases to such as are provided by this act."

The first provision defining the employers who are subject to the act is found in section 5, subd. 2, of part 1. It reads:

"Every person, firm and private corporation, including any service corporation, who has any person in service under any contract of hire, express or implied, oral or written, and who, at or prior to the time of *the accident* to the employee for which compensation under this act may be claimed, shall in the manner provided in the next section have elected to become subject to the provisions of this act, and who shall not, prior to *such accident*, have effected a withdrawal of such election, in the manner provided in the next section."

While not controlling, it is pertinent to note the history of the Michigan act.

By Act No. 245, Public Acts of 1911, the legislature created a commission—

"To make the necessary investigation, and to prepare and submit a report  *  *  *  setting forth a

comprehensive plan and recommending legislative action providing compensation *for accidental injuries or death* of workmen arising out of and in the course of employment."

Section 2 of the act reads:

"It shall be the duty of the commission of inquiry to fully investigate the conditions affecting, and the problems involved in the matter of compensation *for accidental injuries or death* of workmen arising out of and in the course of employments."

The act drawn pursuant to this authority was passed by the legislature without change. While it cannot be claimed that the power of the legislature was limited to enacting the bill prepared by the commission, yet, when that body passed the bill without change, it may be said that it adopted the meaning that must have been intended by the commission.

It is the claim of appellant that lead poisoning contracted industrially is not an accident; that such poisoning, being something that is contracted by a fairly certain percentage of those working in industries where lead is used, cannot be considered as unexpected; that it comes as a gradual, slow process, and hence is not an "accident." The appellee, not agreeing with the reasoning of the board, contends that the act does cover injuries occasioned by lead poisoning, and that such poisoning contracted in the course of employment is an "accidental injury."

The English act of 1897 was entitled:

"An act to amend the law with respect to compensation to workmen for accidental injuries suffered in the course of their employment."

The body of the act provided that:

"If in any employment, to which this act applies, personal injury by accident arising out of and in the course of employment, is caused to a workman his employer shall be liable."

It was not long before it was necessary to determine what was personal injury by accident, and to give a definition of "accident." In *Hensey* v. *White* (1900), 1 Q. B. 481, the language of an earlier case was approved where it was said:

"I think the idea of something fortuitous and unexpected is involved in both words 'peril' or 'accident.' "

In *Fenton* v. *Thorley & Co.*, 72 L. J. K. B. 790, it was said:

"The expression 'accident' is used in the popular and ordinary sense of the word as denoting an unlooked for mishap or an untoward event which is not expected or designed."

Finally, in *Steel* v. *Cammell, Laird & Co., Ltd.* (1905), 2 K. B. 232, the precise point was decided. The applicant, a caulker in the employment of shipbuilders, was seized with paralysis, caused by lead poisoning, and became totally incapacitated for work. In the course of his work, in which he had been employed by the shipbuilders for a period of two years before he became incapacitated, he had to smear either with red or white lead certain places between the plates of ships into which water-tight shoes were put. The poisoning was such as might be expected from the nature of the work. It might be caused either by inhalation, or by eating food without having removed the lead from the hands, or by absorption through the skin. Only a small proportion of cases of poisoning of this description occurred amongst a number of persons working with red or white lead. The poisoning could not be traced to any particular day, and its development was a gradual process, and generally took considerable time. Held, that the lead poisoning could not be described as an "accident," in the popular and ordinary use of that word, so as to entitle the applicant to compensation for personal injury by accident arising out of, and in the course of, his employ-

ment, within the meaning of section 1 of the workmen's compensation act of 1897. *Fenton* v. *Thorley & Co.,* 72 L. J. K. B. 787, and *Brintons, Lim.* v. *Turvey,* 74 L. J. K. B. 474, considered.

The court in the above case [*Steel* v. *Cammell, Laird & Co., Ltd.*] reasoned that, under the act, a date must be fixed as that on which the injury by accident occurred, and it was said:

"It has been suggested that there was a series of accidents by the continuous absorption of lead, by one or other of the three processes named; but this suggestion does not meet the difficulty which arises from the provisions of the act as to notice of the particular date of the accident or injury."

Others of the judges said that the injury was not unexpected; that it was certain that somebody would suffer, and this man turned out to be susceptible to the poison. As a result of this case, it was found necessary to change the act, if cases like this were to be included; so in 1906, less than a year later, the act of 6 Edw. VII., chap. 58, was passed, entitled:

"An act to consolidate and amend the law with respect to compensation to workmen for injuries suffered in the course of their employment."

The body of the act again provides compensation for "personal injury by accident," but it also (section 8) provides that:

"Where the disease is due to the nature of any employment * * * he or his dependents shall be entitled to compensation under this act as if the disease * * * were a personal injury by accident arising out of and in the course of that employment" —if it be one of the diseases contained in schedule 3 of the act.

In that schedule "lead poisoning" and its sequelæ are therein scheduled. Of this act the Encyclopedia of Laws of England, vol. 5, p. 227, states:

"The extension by this act of the principle of workmen's compensation to industrial disease is a new departure. Disease, though contracted industrially, is not an 'accident' in the ordinary acceptation of the term."

It was also said of the act that a new phase in workmen's compensation—compensation for disease arising out of employment—was a new feature in this type of legislation. The language of the act should be particularly noted. It does not attempt to declare an industrial disease an "accident," but gives compensation therefor "as if the disease   *   *   *   were a personal injury by accident."

Considering the condition to be remedied and the history of the Michigan act, and comparing it with the English act of 1897, we are not able to agree with the accident board when it says, referring to the language which it quotes, that our act is broader than the English act, and clearly includes all personal injuries arising out of and in the course of an employment, whether the same are caused by "accident" or otherwise. In the language quoted by the board it is true that the words "personal injury" are used, but in determining the nature of the personal injury intended to be covered by the act, the whole act, with its title, should be examined and considered; and, so examined, we think it should be held that the words "personal injury," as quoted by the board, refer to the kind of injury included in the title and other portions of the act, which plainly refer to "accidental injury to, and death of, employees." The whole scope and purpose of the statute, in our judgment, was to provide compensation for "accidental injuries," as distinguished from "occupational diseases." We must hold, therefore, that the provisions of the act of this State are very similar to the early English act above referred to.

We have shown how the English act was subsequently amended by adding the provision permitting

the recovery of compensation for certain scheduled diseases, caused by, or especially incident to, particular employments—diseases known as occupation or industrial diseases. Not before, but since, the passage of this amendment to the English act, the English courts have sustained the rights of recovery in such cases as are here presented. The framers of our act either did not know of the amendment to the English act, or else they did not intend to permit the recovery of compensation in such cases. If it is said that it is just as important to protect employees against such conditions as are here presented as it is to protect them against injuries arising from what are strictly termed "accidents," our answer is that that is a matter which should be addressed to the legislature. In the absence of a provision in the statute meeting this situation, the court is unable to award a recovery.

Counsel for appellee have referred to some of the English cases where compensation was allowed for injuries caused by poisoning, but an examination of those cases will show that the injuries were purely accidental. *Higgins* v. *Campbell & Harrison, Ltd.* (1904), 1 K. B. 328, affirmed (1905) A. C. 230, is a fair illustration of those cases. There a workman employed in a woolcombing factory in which there was wool which had been taken from sheep infected with anthrax contracted that disease by contact with the anthrax bacillus which was present in the wool. In that case compensation was allowed, and it was held that the workman was injured by accident arising out of and in the course of his employment within the meaning of the English act of 1897. The court treated the disease as caused by an accident, by one particular germ striking the eyeball. It was considered that the accidental alighting of the bacillus from the infected wool on the eyeball caused the injury. It was treated as if a spark from an anvil hit the eye. This may be seen from the statement of Lord Macnaghten:

"It was an accident that the thing struck the man on a delicate and tender spot in the corner of his eye."

We think that this and kindred cases can be readily distinguished from the lead poisoning cases.

The same difficulty about giving notice of the accident or injury noted in the English act applies to the Michigan act. Every employer is required to keep a record of all injuries, fatal or otherwise, received by employees in the course of their employment. Section 17 of part 3 of our statute provides that:

"Within ten days after the occurrence of an accident resulting in personal injury a report thereof shall be made in writing to the industrial accident board on blanks to be procured from the board for that purpose."

And a penalty is prescribed for neglect to make such report.

In the instant case Adams left his place of employment at the usual quitting time on May 29, 1913. He did not return. What knowledge his employer had of his sickness does not appear. It is not apparent what notice could be given under our statute in such a case. If our statute, in its present form, should be held to apply to occupational or industrial diseases, then compensation might be claimed of an employer where the term of employment had been for a brief period, whereas the disease may have been contracted while in the employment of a former employer. All this is provided for in the amendment of 1906 in the English act, where provision is made for investigation and apportionment among employers for whom the employee worked during the previous year "in the employment to the nature of which the disease was due." There is no such machinery or procedure provided for in our statute.

We are not unmindful of the holdings of the supreme court of Massachusetts in *Re Hurle,* 217 Mass.

223 (104 N. E. 336), and *Johnson* v. *Accident Co.*, 104
N. E. 735. In the latter case that court held that the
personal injury of a lead grinder, sickness incapacitat-
ing him from work resulting from the accumu-
lated effect of gradual absorption of lead into his
system, arose "out of and in the course of his employ-
ment" within the workmen's compensation act (Stat.
1911, chap. 751) of that State. That case is founded
upon *In re Hurle, supra,* which was a case of blind-
ness incurred from an acute attack of optic neuritis,
induced by the poisonous coal tar gases escaping from
a furnace about which he was required to work. The
matter of accidental injury was not discussed by the
court. The court said:

"The question to be decided is whether this was a
'personal injury arising out of and in the course of
his employment' within the meaning of those words in
the statute."

The court further, in referring to the comments of
counsel for the employer that the act could not apply
to such an injury as that sustained, said:

"It might be decisive if 'accident' had been the
statutory word. It is true that in interpreting a
statute words should be construed in their ordinary
sense. 'Injury,' however, is usually employed as an
inclusive word. The fact remains that the word 'in-
jury,' and not 'accident,' was employed by the legis-
lature throughout this act."

As "accident" is the controlling word in our act, we
do not think that the Massachusetts decision should be
held to apply here, as the construction of that act has
little, if any, bearing on the Michigan act.

Our attention has been called to the Massachusetts
act, which differs in many respects from our act. That
act is entitled:

"An act relative to payments to employees for per-
sonal injuries received in the course of their employ-
ment, and to the prevention of such injuries."

The whole scope of the act seems to be to provide for compensation for personal injuries received in the course of employment. In many instances where the word "accident" occurs in our statute the word "injury" is used in the Massachusetts statute. It is true that the Massachusetts board is termed an "Industrial Accident Board," but, aside from the use of the word "accident" in that title, we are unable to find the word in the body of the act, except in two instances in section 18 of part 3, which provides for the keeping of a record and making a report by the employer in case of accident. This may be said not to be very controlling; but, in our judgment, it has to do with the inquiry as to the scope of the act. We are unable to follow those cases as authority under our statute.

In New Jersey, in the case of *Hichens* v. *Metal Co.*, N. J. Law Journal (Com. Pl. June 25, 1912), p. 327, which arose under the New Jersey act (P. L. 1911, p. 134) entitled very similarly to the Massachusetts act, to wit—

"An act prescribing the liability of an employer to make compensation for injuries received by an employee in the course of employment, establishing an elective schedule of compensation, and regulating procedure for the determination of liability and compensation thereunder"

—it was held that compensation could not be awarded for a disease known as copper poisoning, caused by contact with the copper filings and inhaling the dust from same by an employee in his work, which involved the grinding and polishing of brass products. This decision cannot be considered as authoritative, as it is that of the court of common pleas, and not the court of last resort.

The Federal compensation act (Act May 30, 1908, chap. 236, 35 Stat. 556 [U. S. Comp. Stat. Supp. 1911, p. 468]), relating to government employees does not

contain the word "accident" in the principal clause, but provides that compensation shall be granted "if the employee is injured in the course of such employment." Subsidiary clauses provide for the reporting of "accidents," and otherwise refer to "accidental injuries."

In the latest opinion of the attorney general, being in the case of John Sheeran, where the employee was a laborer engaged in river and harbor construction, and, while engaged in work in the course of his employment, contracted a severe cold, which resulted in pneumonia, that officer said:

"There is nothing either in the language of the act or its legislative history which justifies the view that the statute was intended to cover disease contracted in the course of employment, although directly attributable to the conditions thereof. On the contrary, it appears that the statute was intended to apply to injuries of an accidental nature resulting from employment in hazardous occupations—not to the effects of disease."

It has been reiterated under the Federal act that acute lead poisoning is not such an injury as entitles an employee to compensation. Similarly, where a workman suffered from cystitis and prostatitis, which he claimed was the result of overwork, it was held that he was merely suffering from disease which was not covered by the terms of the Federal act, and compensation was refused. 1 Bradbury on Workmen's Compensation (2d Ed.), pp. 342, 343.

We are of opinion that in the Michigan act it was not the intention of the legislature to provide compensation for industrial or occupational diseases, but for injuries arising from accidents alone.

2. If it were to be held that the act was intended to apply to such diseases, it would, in so far as it does so, be unconstitutional and in violation of section 21

of article 5 of the Constitution of this State, which provides that:

"No law shall embrace more than one object, which shall be expressed in its title."

That the act, if it were held to apply to and cover occupational diseases is unconstitutional in so far as it does so is shown by the fact that the body of the act would then have greater breadth than is indicated in the title. A careful analysis of the title of the act shows that the controlling words are "providing compensation for accidental injury to or death of employees." No compensation is contemplated except for such injuries. The prefatory words are generally dependent upon the above-quoted clause. The only compensation provided is for "accidental injury to or death of employees," and the last clause of the title restricts the right to compensation or damages in such cases "to such as are provided by this act."

The Massachusetts decisions have no bearing upon this branch of the case for two reasons: One is that the titles of the respective acts differ materially; and the other reason is that Massachusetts has no such constitutional provision as ours above quoted. We have dealt with this question of title too recently to make it necessary to refer to our numerous decisions upon the subject.

For the reasons above given, we are constrained to reverse the order and judgment of the industrial accident board.

Reversed.

McALVAY, C. J., and BROOKE, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.