WIEDA *v.* AMERICAN BOX BOARD COMPANY.

1. WORKMEN'S COMPENSATION—AGGRAVATION OF PREVIOUSLY-EXISTING NONOCCUPATIONAL DISEASE—ACCIDENT.

   Loss of power because turbine failed to function properly may not be regarded as accidental or fortuitous so as to impose liability for workmen's compensation under part of act requiring that injury be due to accident, where in remedying the situation plaintiff turbine operator ran up and down stairs and aggravated a pre-existing heart condition that was apparently unknown to him while pursuing specific instructions as to what to do in the event of a power shortage, an event which was anticipated (CL 1948, § 412.1 *et seq.*, as amended).

2. SAME—ACCIDENT—PROXIMATE CAUSE.

   An accidental injury, to be compensable under the workmen's compensation act, must be more than merely an unusual and unanticipated result; the means must be accidental—involuntary and unintended, and there must be some proximate connection between accidental means and the injurious result (CL 1948, § 412.1 *et seq.*, as amended).

3. SAME—ACCIDENT—PROXIMATE CAUSE.

   An unfortunate result may not be given the retroactive effect of making a particular event or happening accidental in nature which was not of such character when it took place and, thereby, impose liability under portion of workmen's compensation act requiring that injury to be compensable must have been proximately caused by an accident (CL 1948, § 412.1 *et seq.*, as amended).

---

REFERENCES FOR POINTS IN HEADNOTES

[1-4] 58 Am Jur, Workmen's Compensation §§ 195–198, 247, 255.
[1-4] Workmen's compensation: Compensation for death or injury from overexertion and excitement. 6 ALR 1256.
[1-4] Workmen's compensation: Injury or death to which pre-existing physical condition of employee contributed. 19 ALR 95; 28 ALR 204; 60 ALR 1299.
[5] 58 Am Jur, Workmen's Compensation § 26.

4. SAME—AGGRAVATION OF PRE-EXISTING HEART CONDITION—CONDITIONS PECULIAR TO AND CHARACTERISTIC OF EMPLOYMENT—PROXIMATE CAUSE.

    Plaintiff turbine operator's claim that his disability from aggravation of pre-existing heart condition resulted from conditions characteristic of and peculiar to his employment *held*, without basis under record presented (CL 1948, § 417.1 *et seq.*, as amended).

5. SAME—CONSTRUCTION OF ACT.

    The Supreme Court is bound by pertinent provisions of the workmen's compensation act and must interpret them in accordance with the apparent legislative intent in determining whether liability is to be imposed under the particular facts involved in a case (CL 1948, § 411.1 *et seq.*, as amended).

SMITH, J., dissenting.

Appeal from Workmen's Compensation Commission. Submitted April 5, 1955. (Docket No. 17, Calendar No. 46,225.) Decided October 3, 1955.

Fred A. Wieda presented his claim for compensation against the American Box Board Company based on heart attack suffered following exertion during electrical power failure. Award by deputy reversed by commission and compensation denied. Plaintiff appeals. Affirmed.

*Campbell & Campbell,* for plaintiff.

*Lacey, Jones & Doelle,* for defendant.

CARR, C. J. It does not appear that any material facts in this case are in dispute. On February 15, 1952, and for several years prior thereto, plaintiff was employed by defendant as a turbine operator. He was on said date 39 years of age. His employment was concerned with the operation of a steam turbine which generated electricity for the use of defendant's plant. Said turbine was located on 2 floors, or levels, of the building in which it was

placed, separated by a set of metal stairs comprising 26 steps. He was required each hour to make a tour of inspection of the equipment to ascertain if it was operating properly, such tour requiring approximately 5 minutes. Otherwise he observed certain gauges and meters in the furtherance of the same general purpose.

In connection with his work plaintiff was furnished a list of specific instructions as to what should be done in case of a power shortage. It appears from his testimony that 1 such shortage had occurred when he was on duty prior to February 15, 1952. The employer had also caused drills to be carried out by employees connected with the operation of the turbine, the purpose being to prepare each one concerned with reference to the course to be followed in event of the occurrence of a power shortage.

On the date mentioned plaintiff began work at 10 o'clock in the evening. Approximately an hour later, while in the washroom, he heard a noise that caused him to hurry up the stairs to the second floor. He then discovered that the voltage was out of control. From then on it appears that he followed the instructions that had been given to him, taking each step as directed and without any uncertainty on his part as to what it was necessary to do. In the course of his operations another employee, who was plaintiff's superior in the plant, came to his aid. They finally succeeded in getting the equipment working and were advised by another employee that they might turn on an auxiliary switch, which operation resulted in the receipt of electric current from the Consumers Power Company. The turbine was then started. The entire operation consumed approximately 45 minutes.

In endeavoring to restore the turbine to its normal functioning plaintiff hurried, or ran as he testified, up and down the stairs referred to at least 6 times.

His instructions did not specifically require him to run, but apparently he was anxious to restore the equipment under his supervision to its normal operation as soon as possible. At one time during the 45-minute period referred to he experienced a dizzy feeling, which he testified passed away as the result of his shaking his head. After the situation had been corrected, however, he again experienced dizziness, and he was taken to the first-aid room of the plant and then to a hospital where he remained for approximately 10 hours. Thereafter he returned to his home and remained in bed for a period of about 3 weeks.

On April 28, 1952, as found by the workmen's compensation commission, he was employed by defendant as a first-aid attendant, which position he held until September 12th, following, when he was laid off. His application to the workmen's compensation commission for hearing and adjustment of his claim for compensation recited the occurrence on February 15, 1952, as above indicated. Following a hearing before a deputy commissioner an award of compensation was made which, on appeal to the commission, was set aside. On leave granted by this Court, plaintiff has appealed.

The physician who attended plaintiff on the occasion in question was called as a witness in his behalf, testifying that plaintiff had suffered a heart attack referred to as a coronary infarction or coronary occlusion. He summarized his diagnosis of plaintiff's trouble as follows:

"This particular type of infarction that he had, in my opinion was this: That his circulation, his coronary circulation, was sufficient to take care of the needs of his heart under ordinary conditions. There was probably—must have been—narrowing of the lumen, that is, of the hole in the blood vessel, and this sudden exertion made the heart demand

more blood and it couldn't get it. Consequently he had an ischemia present in the heart muscle due to the fact that that particular part of the blood vessel didn't give the heart muscle enough blood, and that developed into the infarction."

The witness further indicated in his testimony, in accordance with the above-quoted statement, that plaintiff on the 15th of February, 1952, did not have a normal heart, and that the coronary thrombosis or occlusion that he then had indicated such fact. It thus appears that there was testimony before the deputy commissioner indicating that there was a pre-existing heart condition apparently unknown to plaintiff. Undoubtedly his activity during the 45-minute period following the power failure aggravated this condition and brought about the heart attack.

Plaintiff bases his claim for compensation on part 2 of the workmen's compensation law.* It is urged, in substance, that the power failure was a fortuitous event, that it resulted in plaintiff's disability, and that the compensation commission was in error in declining to award him compensation. The primary question at issue is whether the statute may properly be interpreted as covering the factual situation presented on this record. It is apparent that the failure of the turbine to function properly was not the result of an accident in the ordinary acceptance of that term. Such failure had occurred on prior occasions and once, at least, when plaintiff was on duty. The conducting of drills in order to prepare defendant's employees concerned in the operation of the turbine for any such occurrence, and the giving of specific instructions as to each step to be followed in remedying the situation, must be regarded as indicating that power shortages were anticipat-

---

* P.A. 1912 (1st Ex Sess), No 10, as amended (CL 1948, § 411.1 *et seq.* [Stat Ann 1950 Rev and Stat Ann 1951 Cum Supp § 17.141 *et seq.*]).

ed by the employer and said employees. The loss of power on the occasion in question may not be regarded as accidental or fortuitous.

It must be borne in mind also that plaintiff's disability did not result directly from the power shortage or from any accidental occurrence in the course of or arising out of his employment. Rather, his unfortunate condition was brought about by his own acts during the 45-minute period following the development of the power shortage. His running up and down stairs was actuated by his own desire to restore the operation of the turbine as soon as possible. A conclusion that there was an accidental occurrence bringing about the heart attack may not be predicated, under the facts here involved, on the fact that his exertions in conjunction with the pre-existing heart condition brought about the result. In *Robbins* v. *Original Gas Engine Co.*, 191 Mich 122, 128, it was said in referring to the distinction to be observed between the means by which an injury is produced and the result of the producing cause or causes:

"It is not sufficient that there be an unusual and unanticipated result; the means must be accidental—involuntary and unintended. There must, too, be some proximate connection between accidental means and the injurious result."

The foregoing statement was quoted by this Court in the recent decision in *Nichols* v. *Central Crate & Box Company*, 340 Mich 232, 235. See, also, *Kutschmar* v. *Briggs Manufacturing Co.*, 197 Mich 146, 150 (LRA1918B, 1133).

In *United States Mutual Accident Association* v. *Barry*, 131 US 100, 121 (9 S Ct 755, 33 L ed 60) the court, in construing an insurance policy, said:

"If a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected

way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means."

In the instant case, as above pointed out, there was nothing in the occurrence preceding plaintiff's acts that resulted in his disability that was unforeseen or unexpected. On the contrary, power shortages were anticipated and arrangements made to deal with them in a proper and methodical manner when they occurred. An unfortunate result may not be given the retroactive effect of making a particular event or happening accidental in nature which was not of such character when it took place.

This Court has repeatedly considered cases involving situations analogous to that in the case at bar. In *Hagopian* v. *City of Highland Park*, 313 Mich 608, it was held that an employee engaged in lifting cans containing rubbish and who suffered an acute heart ailment was not entitled to compensation, said ailment being an ordinary disease of life to which the public generally is exposed and from which plaintiff had suffered prior to the attack on which his claim was based. As in the case at bar, it was not argued that the heart condition was an occupational disease. Likewise, as here, there was no accident. In *O'Neil* v. *W. R. Spencer Grocer Co.*, 316 Mich 320, dependents of an employee of the defendant company sought to recover compensation because of his death which was claimed to have resulted from undue exertion on his part in operating his automobile in heavy snow. There was no showing of an accident in which the employee was involved. In holding that the statute did not authorize the payment of compensation under the facts, it was said (p 324):

. "In our opinion, plaintiffs have failed to supply competent evidence of the fact that deceased received an injury from an accident growing out of and in the course of his employment. Nor can it be said that the death of Mr. O'Neil was caused from a disease due to causes and conditions which are characteristic of and peculiar to the business of the employer and which arises out of and in the course of the employment. The record substantiates the claim that deceased's death was due to a disease of life to which the public in general is exposed."

In *Kasarewski* v. *Hupp Motor Car Corp.*, 315 Mich 225, 232, it was held that the aggravation of a previously-existing nonoccupational disease is not compensable under part 2 of the workmen's compensation law unless the aggravating injury is accidental in character. See, also, *Mooney* v. *Copper Range Railroad Company*, 318 Mich 120. In the case at bar it is not disputed that plaintiff was suffering from a pre-existing heart condition. Under the interpretation of the statute recognized in the cited cases and in other decisions of like character, he is not entitled to compensation unless his injury was the result of an accident. However, there is no proof in this record on which to base a conclusion that plaintiff sustained an injury by accidental means.

In *May* v. *A. H. Powell Lumber Company*, 335 Mich 420, the claim for compensation was presented by dependents of Victor May who was an employee of the Powell Lumber Company. On the day prior to his death he operated a bulldozer which did not function properly. In consequence fumes and smoke resulted from oil splashed over the motor. This caused the employee to cough and gag, and apparently such effects of inhaling the fumes persisted during the evening and night. The next morning at approximately 4 o'clock his death occurred from a heart condition. Medical testimony disclosed that

he was in fact suffering from an advanced coronary condition of a serious nature of which he apparently had no knowledge. It was held that the death of the employee had not been brought about by accidental means aggravating the existing ailment, and that, in consequence, the provisions of part 2 of the workmen's compensation law, under which the claim was filed, could not be construed as authorizing compensation.

In denying compensation in the instant case the commission relied specifically on *McGregor* v. *Conservation Department,* 338 Mich 93. There the plaintiff employee had a pre-existing arteriosclerosis. He was employed by the defendant as a fire warden. On the 11th of May, 1950, following exertion on his part in fighting fires, he suffered a coronary thrombosis, and later sought compensation for the resulting disability. Citing with approval the decision in *Hagopian* v. *City of Highland Park, supra,* it was held that such disability was noncompensable. The plaintiff's claim was first filed under part 2 of the compensation law and subsequently amended to cover claims under part 2 and part 7, in the alternative. The award of the compensation commission was based on part 7, it being concluded that plaintiff's injury was not brought about by accidental means. In the case at bar there is no basis for any claim that plaintiff's disability resulted from conditions characteristic of and peculiar to his employment.

Among other cases, counsel for plaintiff rely on *LaVeck* v. *Parke, Davis & Co.,* 190 Mich 604. In that case the employee suffered a cerebral hemorrhage, resulting in paralysis, while working in a room heated to a high temperature. An award of compensation was made on the theory that the hemorrhage was an accidental occurrence, and this Court affirmed on the ground that such finding was supported by

testimony.   Counsel also cite *Schlange* v. *Briggs Manufacturing Co.,* 326 Mich 552.   There this Court affirmed an award of compensation, it appearing from the record that plaintiff employee, while engaged in the performance of his duties, was thrown or jerked against a machine that he was operating, and that at the time he felt a sharp pain in his chest. It was not disputed that such happening was accidental.

Each case arising under the workmen's compensation law must be determined on the basis of the particular facts involved and in accordance with pertinent statutory provisions.   We are bound by such provisions and must interpret them in accordance with the apparent legislative intent.   The facts in the case at bar are not in dispute and, in consequence, the question is, as before indicated, whether the statute entitles plaintiff to compensation on the theory that his disability resulted from an occurrence accidental in nature.   We cannot so find.   The principles followed in the decisions above cited, particularly the *McGregor Case,* are controlling.   It is, we think, unnecessary to cite other decisions in accord therewith.   The workmen's compensation commission was correct in so holding.

The order from which the appeal has been taken is affirmed, with costs to appellee.

Butzel, Sharpe, Boyles, Reid, Dethmers, and Kelly, JJ., concurred with Carr, C. J.

Smith, J. (*dissenting*).   I regret that I cannot join in the opinion of the Chief Justice.   It is my belief that his opinion perpetuates a misconstruction of a remedial statute and amendment thereto and that the law is growing more confused with the passage of time and the accumulation of cases.

Claim is made under part 2 of the act. The theory of the plaintiff is that he suffered an "accident" at

his work. The Chief Justice concludes that he did not. I cannot agree.

What is the meaning of the word "accident" as employed in the workmen's compensation act? Our Court has frequently and recently divided on the question. Much of our present difficulty traces back to language employed by Mr. Justice Stone in *Adams* v. *Acme White Lead & Color Works* (1914), 182 Mich 157 (LRA1916A, 283, Ann Cas 1916D, 689, 6 NCCA 482). For that reason alone I will examine it in some detail. The case involved lead poisoning, an ailment which we would today class as an occupational disease and, in fact, it was so classified by the then industrial accident board (p 158). The claim was made on behalf of the injured workman that our act, in granting compensation for "a personal injury arising out of and in the course of his employment," was broad enough to cover occupational diseases. The Court held not. It held that the act required an accidental injury. As to what was an accident, it cited and quoted (p 164) from *Hensey* v. *White,* (1900) 1 QB 481, 485 (69 LJQB 188, 81 LT 767) the following language, which in essence is found in our cases up to the present time:

" 'I think the idea of something fortuitous and unexpected is involved in both words, "peril" or "accident." ' "

The *Hensey Case,* so relied upon in both language and, subsequently, in principle, warrants critical examination. It was a case in which a workman was injured (ruptured) while "doing his ordinary work in the ordinary way," there being nothing fortuitous in what happened. For this reason it was held that he had not suffered an accident and recovery was denied.

There are 2 difficulties with this English decision. The first is that such construction of the word "ac-

cident" does violence to our language. Words in a statute should receive their ordinary meanings, unless the context forces some subtle use. In our usual speech, when a man goes to his work and breaks his leg, or ruptures himself in the performance of such work, even though it was merely his ordinary work done in the ordinary way, he has suffered an accident at his work. It is no less an accident, of course, if something falls from the ceiling and hurts him. That, too, is an "accident." The idea of the unexpected is predominant, and it is present in both uses of the word. The difference in the uses, putting it very roughly, is that the one use refers to a cause and the other to an effect. But both uses are permissible and both form a part of our constant, daily speech.

Not only did the construction of the English court in the *Hensey Case* do violence to the language, but also to the plain purpose, of the act. The statute, as well as the employer, takes human beings as it finds them. Not all are stalwart and able. The weak and the stumbling must also work, and, if they are injured in their work, even though one stronger might not have been, they are equally protected. *Hills* v. *Oval Wood Dish Co.*, 191 Mich 411. There are some who complain that this means opening wide the flood gates, turning a workmen's compensation act into general insurance for the sick and needy. Not so. The claimant still must prove a direct causal connection between work and injury. This is the essential link. Lacking it, the act does not speak. But if the injury comes from the work, compensation should be paid, even though one of more robust physique would not have suffered therefrom.

Not surprising is it, then, to find that the *Hensey Case* was overruled, in the land of its birth, after a very brief span of life. The point at issue, the precise point now plaguing our commission, our

bench, and our bar, was explored in detail by the highest English court in *Fenton* v. *J. Thorley & Co., Ltd.,* (1903) AC 443 (72 LJKB 787, 89 LT 314), some 10 years prior to our decision in the *Adams Case.* This *Fenton Case* was, like the quoted *Hensey Case,* a rupture case. According to Lord Macnaghten (p 445):

"Fenton was a man of ordinary health and strength. There was no evidence of any slip, or wrench, or sudden jerk. It may be taken that the injury occurred while the man was engaged in his ordinary work, and in doing or trying to do the very thing which he meant to accomplish."

Lord Macnaghten then continued, commenting on *Hensey* v. *White, supra* (pp 445, 446):

"The court of appeal held that the injury which Fenton sustained was not 'injury by accident' within the meaning of the act. In so holding they followed an earlier decision of the court in the case of *Hensey* v. *White,* which in its circumstances is not distinguishable from the present case. In *Hensey* v. *White* a passage was cited from the opinion of Halsbury L.C. in *Hamilton, Fraser & Co.* v. *Pandorf & Co.,** in which his lordship said: 'I think the idea of something fortuitous and unexpected is involved in both words "peril" or "accident." ' Founding themselves upon that expression, the learned judges of the court of appeal held in *Hensey* v. *White,* as they have held here, that there was no accident, because (to quote the leading judgment) there was 'an entire lack of the fortuitous element.' What the man 'was doing,' it was said, 'he was doing deliberately, and in the ordinary course of his work, and that which happened was in no sense a fortuitous event.' To the expression as used by Lord Halsbury in the passage in which it occurs, no possible objection can be taken; but it is, I think, to be regretted that the

* (1887) 12 AC 518 (57 LJ QB 24, 57 LT 726).

word .'fortuitous' should have been applied to the term 'injury by accident' in the workmen's compensation act. If it means exactly the same thing as 'accidental,' the use of the word is superfluous. If it introduces the element of haphazard (if I may use the expression), an element which is not necessarily involved in the word. 'accidental,' its use, I venture to think, is misleading, and not warranted by anything in the act."

Lord Robertson's opinion concurred. Addressing himself to the meaning of the word ·"accident" he held as follows (p 452):

"Much poring over the word 'accident' by learned counsel has evolved some subtle reasoning about these sections. I confess that the arguments seem to me to be entirely over the heads of parliament, of employers, and of workmen. No one out of a law court would ever hestitate to say that this man met with an accident, and when all is said, I think this use of the word is perfectly right. The word 'accident' is not made inappropriate by the fact that the man hurt himself. This use is indeed directly sanctioned by the act itself, for s. 1, sub-s. 2 (c),\* plainly implies that an accident giving right to compensation may be attributable to the fault of the injured man himself. In the present instance the man by an act of over-exertion broke the wall of his abdomen. Suppose he had by the same act broken his leg, the question would be the same. But suppose the wheel had yielded and been broken by exactly the same act, surely the breakage would be rightly described as accidental. Yet the argument against the application of the act is in this case again exactly the same—that there is nothing accidental in the matter, as the man did what he intended to do. The fallacy of the argument lies in leaving out of account the miscalculation of forces, or inadvertence

---

\* This is the wilful misconduct exclusion; Michigan counterpart, section 2 of part 2 of original act (PA 1912 [1st Ex Sess], No 10, now CL 1948, § 412.2 [Stat Ann 1950 Rev § 17.152]).

to them, which is the element of mischance, mishap, or misadventure."

The house of lords, then, and upon this reasoning, overruled the case of *Hensey* v. *White, supra.* In the same decision the court, through Lord Macnaghten (p 448), used the expression, also quoted in the *Adams Case* (p 164), that:

"The expression 'accident' is used in the popular and ordinary sense of the word as denoting an un-looked-for mishap or an untoward event which is not expected or designed."

Not only is it clear from the quotations hereto-fore cited that the court completely rejected the theory of the fortuitous event (as distinguished from an incident in the course of ordinary work) as the sole meaning of the word "accident" but Lord Mac-naghten explains in detail (p 446) the meaning of the term "mishap" in the above quotation, employed by our Court in the *Adams Case:*

"If a man, in lifting a weight or trying to move something not easily moved, were to strain a muscle, or rick his back, or rupture himself, the mishap in ordinary parlance would be described as an accident. Anybody would say that the man had met with an accident in lifting a weight, or trying to move something too heavy for him."

The Court accordingly held for the claimant, that in suffering the rupture, he had suffered an accident.

We note, in passing, that there thus seems to be much support for the statement in Justice POTTER'S dissent in *Twork* v. *Munising Paper Co.*, 275 Mich 174, 184, almost a quarter-century later, that the decision in the *Adams Case* "is based upon false premises and disregards the plain language of the statute."

Why have we reviewed in detail these English cases? Certainly they do not control us. Yet we are shortly to examine the 1943 amendments to our act and their full significance can be appreciated only against the background of the pre-1943 situation. It is important to this background to bear in mind that the language of our Michigan act was adopted from the English and Scottish acts on the same subject (*Hills* v. *Blair,* 182 Mich 20), and that, generally speaking, under such conditions of adoption it will be presumed that the gloss of decision was recognized by the adopting State and was imported with the act. *People, ex rel. Attorney General,* v. *Welch's Estate,* 235 Mich 555. Our decisions, however, followed the overruled *Hensey* theory, namely, that a workman who is injured in his employment while doing his ordinary work in the ordinary way has not suffered an accident. We thus assigned a restricted and curtailed meaning to the word "accident," a meaning at variance with its meaning in ordinary speech. Since such meaning excluded that great body of cases in which a man suffered disabling injury at his work through no fault of his own, but without the intervention of any fortuitous or outside force or condition, subtle distinctions grew through the years, as the court sought, as always, to interpret the act in the light of its objectives in the mass of cases pressing upon it. In some, in fact, I find nothing more than an unexpected result of doing one's ordinary and usual acts in his usual way. Thus in *Watson* v. *Publix Riviera Theatre,* 255 Mich 115, the plaintiff was an actor who turned somersaults. On one of them "plaintiff's leg gave way and he fell." The Court held that his injuries were the result of an accident. As recently as *Nichols* v. *Central Crate & Box Co.,* 340 Mich 232, 236, we interpreted this case as involving a truly accidental occurrence. It involved, we said (p 237),

"the sudden giving way of a member and consequent falling." Yet in the case at bar we have the sudden giving way of the heart and it is held no accident. I cannot reconcile the 2 cases. Does proper distinction lie in the circumstance that in the case before us claimant had (unknown to himself) a pre-existing heart difficulty? If so, we are confronted with *Hurley v. Selden-Breck Construction Co.*, 193 Mich 197. There the plaintiff was Arthur Hurley, a brick mason by trade. While lifting a terra cotta window sill into place he suffered a strangulated hernia. It was argued that he had not suffered an accidental injury. But our Court allowed compensation. It cited (p 199) with approval *Bell v. Hayes-Ionia Co.*, 192 Mich 90, 94, and held that:

"'structural weakness or actual pain, antedating the injury alleged, in the region where the injury occurred, does not preclude a recovery if the injury itself is distinct and the result of a particular strain causing a sudden protrusion of the intestine.'"

Again I have trouble with reconcilation. The claimant's heart condition was equally the result of a particular strain. Dr. Ramsdell so testified.

As the cases have multiplied through the years the distinctions have grown more subtle and more numerous and I must confess anguish at any thought of reconcilation on sound differences in legal principle. Fact differentiations, of course, can always be pointed out, but they furnish no guide for tomorrow's case. The truth of the matter is, we have been attempting the impossible, the differentiation of the accidental means from the accidental result, a differentiation easy to hypothesize but impossible to make in practice. Thus a man is at work. He is straightening a bent piece of material. He does it every day. On this occasion he exerts too much pressure. If the material breaks, we say he broke

it by accident.  If his abdominal wall breaks, we say it is no accident.  Or is it?  We commence our laborious search.  Is this his ordinary work?  Or does his ordinary work involve less stubborn material?  How will we define the strength of material which causes him to pass the border enclosing ordinary work?  Did his work involve over-exertion?  What is standard exertion for the work?

This factor of the exertion of the claimant has assumed a role of much prominence in our determination of whether or not the workman had suffered an accident.  This is probably an inevitable result of our emphasis upon the fortuitous element to the exclusion of the ordinary work done in the ordinary way.  The exertion test goes back for many years.  We find it before the 200th volume of the Michigan reports and we find it in today's advance sheets.  In *Stombaugh* v. *Peerless Wire Fence Co.,* 198 Mich 445, a heart-failure case, the industrial accident board found that the workman was "not used to this heavy work and exertion."  This Court, in reversing the award, pointed out that "the wall of one auricle being [was] so thin that 'any exertion at all might have been the cause of its breaking.' "  And in *Nichols* v. *Central Crate & Box Co.,* 340 Mich 232, 237, we note that the claimant's work " 'required a degree of physical exertion not shown to have been unusual to or greater than that ordinarily experienced in the general field of common labor.  Exertion to that extent did not constitute a fortuitous event.' "

But the difficulty with making compensation turn upon the difference between ordinary exertion and overexertion is that it forces the commission and this Court into an appraisal of degrees of exertion as between respective claimants, or as between respective jobs.  If we apply the exertion test to measure exertion beyond the capacity of the ordinary person, then

the workman who is, unfortunately, substandard in strength can never recover, while his muscularly well-endowed brother will always receive compensation. I cannot accept this result. I cannot believe that it was the legislative intent to protect only the strong, letting the weak lie where they fall.

The act contemplates no such appraisal of degrees of exertion. It takes the workman as it finds him. What is overexertion for one is underexertion for another. What is stress and strain for one is relative peace and quiet for a third. Humans differ in all of these characteristics.

The exertion test leads to equally untenable results if we apply the test to measure the exertion usually required by the employee's job. In such event, if we have a job that is so voracious in its demands upon the human system that no one, not even the strongest, can do the work and keep his health, then no one will ever recover compensation for it. I cannot conclude, either, that it was the legislative intent to give such work immunity, so far as compensation is concerned. Combinations of the above tests may be employed, but aside from the confusion and complications resulting there is a decisive and compelling circumstance militating against the use of any measure of exertion as a test for compensability: The legislature has set up no standard whatever for guidance. A factor so crucial could not have been left undefined, had it been the legislative intent that it control.

The question we have been forced to answer, then, upon our interpretation of the meaning of the act, is this: Is the injury the unexpected result of ordinary work or is it the ordinary result of unexpected work? This question is nothing more or less than a verbal puzzle. As long as compensation is made to turn on it we will have constant litigation and distinc-

tions will multiply beyond all hope of reconciliation. Mr. Justice Cardozo's concern in his dissent in *Landress* v. *Phoenix Mutual Life Insurance Co.*, 291 US 491, 499 (54 S Ct 461, 78 L ed 934, 90 ALR 1382), comes forcibly to mind:

"The attempted distinction between accidental results and accidental means will plunge this branch of the law into a Serbonian bog."

Thus we draw close to the 1943 amendment. By the year 1941 there was much publicly expressed dissatisfaction with the act. Two governors, one now a distinguished member of this Court, had recommended revision. The law, it was said, was "inadequate today for our present industrial economy." Amendments were recommended "to bring about comprehensive liberalization of its provisions." (*Anderson* v. *General Motors Corporation*, 313 Mich 630.) A study commission was set up accordingly.* Its report is found in 1943 House Journal, page 318, *et seq.* The matter of personal injuries received much attention. The committee's report (not unanimous) read in part as follows (p 320):

"PART II

DEFINITION OF INJURIES; AND COMPUTATION
OF BENEFITS

"One change in this part of the proposed act abolishes the schedule of 31 occupational diseases contained in the 1937 amendment to the present law and also abolishes the requirement that injuries be accidental."

Other members of the study commission were not, however, like minded. Their views respecting the matter of the requirement of an "accident" and their

---

* See House Resolution No 78, 2 House Journal 1941, p 1179.—REPORTER.

statutory recommendation with respect thereto follow verbatim (p 337):

"But we do insist that there should not be deleted from the present law, as the other 2 voting members propose, the fact that all other personal injuries must be accidental. Otherwise it is evident to any reasonable minded person that grave injustice will be worked against an employer and force up insurance rates."

It was proposed by them that section 1 of part 2 be amended to read as follows (p 337):

"Sec. 1. If an employee receives an accidental personal injury arising out of and in the course of his employment by an employer who is at the time of such injury subject to the provisions of this act, he shall be paid compensation benefits in the manner and to the extent hereinafter provided, or, in case of his death resulting from such injury, compensation benefits shall be paid to his dependents as hereinafter defined."

It is fair to say, then, that the legislature had clearly before it at this time the question of whether or not the requirement of accident in the act, as interpreted by the Court, should be retained. Its decision is found in the act as amended and passed, reading, in part, as follows:

"Sec. 1. An employee, who receives a personal injury arising out of and in the course of his employment by an employer who is at the time of such injury subject to the provisions of this act, shall be paid compensation in the manner and to the extent hereinafter provided, or in case of his death resulting from such injuries such compensation shall be paid to his dependents as hereinafter defined. The term 'time of injury' or 'date of injury' as used in this act shall in the case of a disease or in the case of an injury not attributable to a single event be the last day of work in the employment in which

the employee was last subjected to the conditions resulting in disability or death." (CL 1948, § 412.1, [Stat Ann 1950 Rev § 17.151].)

It will be observed that the insertion of the suggested word "accidental" has been rejected. It should also be noted that the same amendment undertook a wholesale excision of the words "accident" and "accidental injury," from other portions of the act, and the substitution of the word "injury." *Anderson v. General Motors Corporation, supra.* Our words in *People v. Adamowski,* 340 Mich 422, 429, would seem particularly applicable at this point:

"When the legislature affirmatively rejected the statutory language which would have supported the State's present view, it thereby made its intention crystal clear. We should not, without a clear and cogent reason to the contrary, give a statute a construction which the legislature itself plainly refused to give."

Legislative action of even greater significance was, however, embodied in the same amendment. The legislature, it will be noted, has now authorized compensation for personal injury due to disease, for personal injury not attributable to a single event, and for personal injuries attributable to a single event. Why the employment of this word "event" in speaking of injuries? It will be recalled that the word "accident," in its common usage, and as interpreted by the highest English court in the *Fenton Case,* involved both the idea of cause and the idea of effect. One might suffer an accident, not in doing his ordinary work in the ordinary way, but by some wholly unexpected or fortuitous condition or incident. Such was the "cause" aspect. Or he might suffer an accident as the unexpected result of some ordinary task, such as the rupture case. This is the "effect" aspect. As we have seen, however, our

Court interpreted the word "accident" to embody only the cause aspect, excluding the unexpected result of ordinary work. The word "event," however, is properly subject to no such ellipsis. It is clearly and indisputably a word referring to both cause and result. It is a word synonymous with occurrence and includes all of the steps or incidents from first cause to final effect. Should authority be demanded, beyond the authority of common speech, Webster's New International Dictionary (2d ed) will illumine the point. The result, then, is that the word "accident," even where applicable in the act and its title, has now been restored to its original meaning. It refers to both cause and effect. It includes not only the unexpected incident or condition but also the unexpected result of ordinary work. Thus we have come full circle and have reached by remedial legislation the same result as the English courts by interpretation.

It is my opinion, then, that the word "accident" as employed in the act comprehends the unexpected result, as well as the unexpected cause, that we should now so hold, and that we should overrule those cases inconsistent therewith. Let it not be thought that such action would unsettle the law of our jurisdiction. Our Court has divided repeatedly on this matter, and such divisions have contributed little to clarity or certainty in a branch of the law which, above many others, should be as certain, as clear, and as nonlitigious as possible.

The State of Florida has undergone similar travail on this very question. It would not be fruitful to point out in detail how the Florida law became confused and unsettled. The supreme court's recent action, in *Gray* v. *Employers Mutual Liability Ins. Co.* (Florida), 64 So2d 650, 651, is self-explanatory:

"It is enough, then, if there is an unexpected *result*, even though there was no unexpected *cause*, such as a slip, fall or misstep, in order to constitute an 'accident' within the meaning of the workmen's compensation law; and insofar as the *McNeill* and *Peterson Cases, supra*,* hold that an injury is not compensable if it happens while the claimant is performing his ordinary work in the usual manner, these decisions are hereby modified, and we re-affirm the rule laid down in *Duff Hotel Co.* v. *Ficara*, 150 Fla 442 (7 So2d 790), that an unexpected injury received in the ordinary performance of a duty in the usual manner is an injury 'by accident' within the purview of the workmen's compensation law, without the showing of anything fortuitous."

Upon the above analysis, Wieda is entitled to compensation. The disability arose out of and in the course of employment, and, as the commission properly found, there was a direct causal relation between the power failure and his heart failure.

But even should my view as to the proper interpretation of the word "accident" be rejected, Wieda is still entitled to compensation under the facts of this particular case, because certain distinctions, urged upon us by the plaintiff, must be made.

The defendant, American Box Board Company, insists that there was no "accident." It argues, citing *Nichols* v. *Central Crate & Box Company, supra,* that "this Court has consistently maintained that it is not sufficient that the *results* be unexpected— the *means* must be involuntary or unintended." It then points out that the remedial steps to be undertaken in event of power failure had often been rehearsed, hence, it argues that it could not be said that the incident was unexpected, though, of course, the results (the physical injuries and death) were.

---

* *McNeill* v. *Thompson* (Florida), 53 So2d 868, 869; *Peterson* v. *City Commission, City of Jacksonville* (Florida), 44 So2d 423.—RE-PORTER.

As it says: "One does not train for, drill and rehearse an 'accident.'" It relies upon the case of *McGregor* v. *Conservation Department*, 338 Mich 93, 101, in which compensation was denied a fire warden, the Court stating:

"In the instant case, plaintiff, at most, was doing the hard labor customarily performed by him and fellow employees during at least 2 months of each year which required a degree of physical exertion not shown to have been unusual to or greater than that ordinarily experienced in the general field of common labor. Exertion to that extent did not constitute a fortuitous event."

It should be observed, in connection with the *McGregor Case*, that the compensation commission relied upon this case in denying Wieda compensation, its holding in this connection being as follows:

"There can be no doubt from an examination of the medical testimony that there was a causal relationship between the power failure and the coronary occlusion through aggravation of an unknown pre-existing arteriosclerotic condition in his heart. The disability arose out of and in the course of the employment. However, we can see no valid distinction between this case and the case of *McGregor* v. *Conservation Department*, 338 Mich 93, decided by our Supreme Court on November 27, 1953. The award of the deputy commissioner is reversed and the plaintiff is not entitled to compensation."

The plaintiff-appellant, on the other hand, insists that the power failure was an unexpected and fortuitous event, in the sense heretofore employed by this Court, and that its remedy involved more than ordinary exertion. In partial reply to the *McGregor Case, supra,* he points to a night watchman case (*Schroetke* v. *Jackson-Church Co.,* 193 Mich 616 [LRA1917D, 64]), in which the premises caught

on fire, the night watchman's previously-affected heart gave out due to his fire-fighting efforts, and this Court reversed an order denying compensation, stating (pp 621, 625):

"We think this case fairly presents the question whether compensation can be recovered where death or disability results from overexertion and excitement caused by an accidental fire such as broke out in this case, where the deceased was afflicted with heart ailment, and where death was due to heart failure caused by deceased's condition of the heart and the excitement and exertion incident to the fire.

\* \* \*

"In the instant case the whole circumstance, including the fire, the overexertion and the excitement of the deceased, may be said to have been an accident. It was certainly a fortuitous circumstance."

If I were called upon to base this decision upon whether or not there was an "accident," in the sense of an extraneous, fortuitous occurrence as distinguished from ordinary work, I would feel no hesitation in saying that there was. The emergency confronting the plaintiff was serious in the extreme. The plant was threatened with the "disintegration," according to the record, of a revolving turbine. The fact that careful foresight makes plans for rapid and efficient remedial measures in case of an accident makes the accident nonetheless a threatening emergency when and if it occurs. The danger of the turbine's distintegration, the plaintiff's repeated and hasty trips up and down the stairs as various measures of relief (yes, measures long planned for such a catastrophe) were employed, the sense of pressure and peril so well described in the record, all constituted and contributed to unusual exertions in coping with an out-of-the-ordinary and fortuitous event. The "rehearsal" aspect is completely imma-

terial. There is constant rehearsal of fires in our school buildings, and of "man overboard" at sea, as well as of power failures in industrial power plants. Let those who will deny that, when the fire actually occurs, or the seaman falls overboard, the dreaded emergency does not involve the most intense pressures and exertions, far beyond normal routine, even the routine of drills. Our mind goes back to the morning of Pearl Harbor. Our understanding is that Admiral Bellinger, at 0758 that fateful morning, from his headquarters on Ford Island, broadcast the news of the Japanese attack simultaneously with the dropping of the first bomb. His words were "Air Raid, Pearl Harbor." Then, knowing something of the human reaction we must take into account in the case now before us, he added the pregnant words: "This is no drill." It was the real thing. There is a vast difference.

But I do not place my decision on this ground, valid though I believe it to be. I place it on the ground that the word "accident" includes both the unexpected cause and the unexpected result, that the claimant suffered an accident, an injury from a single event or series thereof which arose out of and in the course of his employment.

The commission's denial of award should be reversed and the award of the deputy commissioner should be affirmed, with costs to appellant.